**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**COLLINS & AIKMAN CORP., Respondent.**

No. 21238.

United States Court of Appeals Fifth Circuit.

Nov. 23, 1964.

Allison W. Brown, Jr., Atty., N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Dominick L. Manoli, Associate Gen. Counsel, N.L.R.B., Washington, D. C., Arnold Ordman, General Counsel, Leo N. McGuire, Attorney, N. L. R. B., for petitioner.

Frank Constangy and Constangy & Prowell, Atlanta, Ga., for respondent.

Before BROWN and BELL, Circuit Judges, and SPEARS, District Judge.

JOHN R. BROWN, Circuit Judge.

This is a petition to enforce the Board's cease and desist order [1] finding the Employer guilty of violating § 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1). We enforce in part.

The charges grew out of the unsuccessful efforts of the Union [2] to organize the Employer.[3] The organization efforts began in March of 1962, but all of the challenged events took place within three weeks of the agreed election held on October 11, 1962. A majority voted against the Union.[4]

Several factors stand out in this record. The Employer was vigorously opposed to the Union. It made no bones about its opposition. It sought support from employees, individually and collectively. In these efforts the Employer emphasized the economic disadvantage of its plant at Dalton, Georgia, because of the extra $100,000 expense incurred from having to ship yarn from its finishing plant in North Carolina to Dalton for tufting into carpet with the carpet being sent back to that North Carolina plant for finishing.

At the same time, it was equally well known, both by repeated oral statements and by a number of written notices and communications, that the Employer recognized the absolute right of its employees to join and campaign for the Union. The Employer made it equally clear that no one would suffer any discrimination of any kind for having supported or not supported the Union. And it is a singular fact that so far as the record reveals, there is not one instance of discriminatory firing, discharge, or refusal to rehire, not a single § 8(a) (3) case is presented. Indeed, what—and all—of the evidence supporting the Board's order came from persons who were still at work for the Employer. This included those who were vigorous advocates for the Union, those who had been and had become either lukewarm or changed their mind, and those who were opposed.

Also well known was the position of everyone in the plant, those strong for the Union, those opposed, and those perpetual backsliders whose position was determined by their present listeners. The campaign was open and intense, the Employer using some 70 written notices, pamphlets, letters, or the like, and the Union some 38. All of the employee-witnesses expressly disclaimed any appre-

1. 143 N.L.R.B. No. 2.

2. Textile Workers Union of America, AFL–CIO.

3. Collins & Aikman Corporation. It owns a number of mills, one or two of which are unionized, the others not.

4. On the election held October 11, a total of 78 votes were cast of which the majority was for "no union." The Union's objections were consolidated with the Unfair Labor Practice case for hearing, and the Examiner made findings but in accordance with its rules remanded the representation case to the Regional Director. The RC case is not now before us.

hension for job security in the event their campaigning activities were to result in a Union victory.[5]

But for some reason which even the Examiner characterized as strange, during the later stages when many of the men were indicating a waning enthusiasm for the Union and some were defecting, a feeling became current that were the Union defeated, then the Employer would discriminate against those who had been, at some stage, strong union adherents. In other words, if the Employer were unsuccessful in opposing the Union, there would be no discrimination, but if it prevailed on its employees to reject the Union, then there would be. This was the immediate cause for several of the disconnected incidents as one or more employees sought or were given assurances by management that this would not occur.

These § 8(a) (1) violations fall into two main groups. The first is made up of disconnected incidents involving things said, requested, or promised as between management representatives and one or a few of the employees. The second involves two writings sent by management to each employee at his home, one, eight days before, and the other, on the eve of the election. The first was a letter (October 3), the second a tear sheet (October 10) from a local paper containing an advertisement by a local booster club.

■ Although we think that as to the first group, credibility choices at times are based on standards which approach the very brink of those disapproved and re-disapproved by us in N. L. R. B. v. Florida Citrus Canners Cooperative, 5 Cir., 1961, 288 F.2d 630, 636–637; 1963, 311 F.2d 541, 543,[6] we conclude that as to several of the incidents, the evidence was sufficient to sustain the Board's findings.

This would include the Colter incident of September 20 and the following day. There was sharp conflict between Colter (the employee) and Manager Thomas as to which of the two proposed that Colter prepare a statement for posting showing that he had changed from a Union supporter, and after declining to do that whether it was Colter or Thomas who first proposed that he give such advice orally to both shifts during a shift change over.

We reach the same conclusion concerning the Johnson-Dover matter in which the Board credited Johnson, rather than Thomas, and the other employee Dover. About August 1, Johnson told Thomas that he was "going to get out of the union" and "turn over on their [employer's] side." This was wholly voluntary without solicitation or encouragement. It was some four weeks later according to Johnson that Thomas called him and Dover and asked them to draw up a paper saying they would have nothing more to do with the Union and circulate it through the plant for other signatures. Johnson's testimony leaves much to be desired, but thin as it is, it passes muster.

■ But we find wholly unsupported the finding as to Charles Baker. It is uncontradicted that Thomas did talk to Baker and, as with others, attempted to persuade him against the Union. In the course of this, Thomas acknowledged that a reprimand given Baker several months earlier (in no way connected with the Union campaign problems) resulted from an erroneous construction of company rules, and he assured Baker that he was sorry and the mistake would not be repeated in the future. There is, however, no substantial basis for the Board's conclusion that this penitence and promise to be good in the future was conditioned on Baker's willingness to forget the Union.

■ Likewise, we reject the Board's conclusion as to the Colter-Pass-Shepherd occurrence. Shepherd and Pass told Thomas in effect that they wished to withdraw from the Union. They expressed the concern described above relating to

5. We mention this simply as a part of the picture without attributing to it any exculpatory effect. Cf. N. L. R. B. v. Donnelly Garment Co., 1947, 330 U.S. 219, 231, 67 S.Ct. 756, 91 L.Ed. 854.

6. See also N. L. R. B. v. Walton Mfg. Co., 5 Cir., 1963, 322 F.2d 187, 190.

their fate if the Union were defeated. Colter came into this meeting. Thomas suggested that if their feeling was against unionization, they should communicate it to other employees. Someone suggested that it be in a "letter" and after one of the employees started to act as the scrivener, Thomas volunteered to do it for them and proceeded to write some undisclosed, unidentified paper. There was much discussion about its possible "legality" and whether it was more or less "binding" on the Employer. In any event, these employees did not finally accept this drafting assistance from Thomas, for later that day—wholly on their own—they went to a local lawyer, unconnected with the Employer, who drafted a statement suitable for them to distribute to their fellow employees. Not a trace of any of the asserted coercive promises supposedly contained in Thomas' draft found its way into the lawyer's product, and if it had any effect on any one, there is neither evidence of it nor of the paper itself. The initiative was wholly that of these employees, not Thomas, whose comments carried no more weight than his writing.

■ The Carl Baker-Parker affair is almost trivial. A couple of weeks before the election, Carl Baker and Parker, having decided to no longer support the Union, but concerned by the persistent feeling of post-election discrimination, went to see Sparks, the top management, proposing that they be laid off to avoid any implication one way or the other. Sparks dissuaded them from this because with work available, unemployment compensation benefits would not be payable, and a leave of absence would be without pay. Since these employees had frankly expressed their disapproval of the Union and their opposition to it, it was perfectly natural and legally permissible that Thomas suggest that they make their wishes known to others. Any discussion about signing a paper had to do only with the mechanics of passing this word. There was no outright request followed by an outright refusal. At most, it was a decision "not to sign a paper because I would tell people myself how I felt about things."

■ But as to the second group, comprising the mailings to the employees, we disagree with the Board's holding that these were coercive threats. The letter was, to be sure, a frank plea to vote against the Union. It disclaimed any purpose to make promises, emphasis was placed on the "progress and growth" of "the modern plant" having "the best working conditions in Dalton." For the Employer it claimed (with no record denial anywhere) that we have "better wages and better fringes than any textile plant in Dalton."

Recognizing that there would always be demands for improvements and changes, the letter rhetorically asked how can this be done—"can we get them better and quicker by ourselves or can the [Union] do better than we can?" This led then to the climax of the letter which stated that the way "to judge what the [Union] can do * * * is to look at what they have done for other employees." It then referred to an attachment listing the names and locations "of only a few of the hundreds of plants that have been closed down where the employees had a union contract." The letter was careful not to charge that the Union closed them down or "was the sole or part of the reason they shut down." Rather, it advanced the argument that the Union "is not the answer to economic problems and does not guarantee the future of a plant." Thus, it continued, the Union "didn't shut these plants, but it could not keep them from closing when the company decided it was necessary to close down." Pointing out that in these closed plants, there were no wages, no fringe benefits, and no job security, the letter urged that this "proves that the [Union] cannot guarantee any of these things * * *." And "* * * only in plants where employees and managment work together in a profitable, successful, and progressive Company can the future of everybody be secure." The letter ended with the assertion that the Employer's "record proves that we have better job security than any

of the [Union] members" at the closed plants and urged "Don't gamble your future security and progress by voting for the [Union]. Let's continue to grow together—vote no."

The argument before the Court revealed that the Board's criticism is directed to the last sentence. In considering this letter the Examiner summarized the Employer's contention that the letter could be interpreted to mean that "the employees' job would be imperiled if the union should exact from [the Employer] monetary concessions which would make its operations at Dalton unprofitable." But the three-man Board, with one Member dissenting, found that the letter constituted a violation because "it cannot be assumed that the employees would be sufficiently astute or sophisticated to read [the] * * * meaning * * *" attributed to it by the Employer.

It is without dispute that the Union's campaign literature previously distributed contained a list of nonunion plants which it said had been closed. This letter was the Employer's answer to that charge. When it is read as a whole and considered in the actual context of the situation prevailing in this plant, we do not think the last sentence can be excised to find the coercive threat of anti-union discrimination. The language, to be sure, could have been more artful. But it is merely an extension of the argument persuasively put forward that real job security rested upon continued profitable operations of the plant. It was wholly proper for the Employer to urge that the Union was not necessary to protect their interests.

■ In reaching that conclusion, we have looked at it in the light of the existing situation, not through the eyes of either the astute, sophisticated, unastute or unsophisticated. The test, to be true, must be an objective one, but its probable impact must be measured against the situation then prevailing, not one existing at another time or place. N. L. R. B. v. W. L. Rives Co., 5 Cir., 1961, 288 F.2d 511, 516; N. L. R. B. v. Dalton Brick & Tile Corp., 5 Cir., 1962, 301 F.2d 886,

897; Local 357, International Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. N. L. R. B., 1961, 365 U.S. 667, 677, 81 S.Ct. 835, 840, 6 L.Ed.2d 11, 19 (concurring opinion). This is particularly important when, in assaying the legality of words spoken or written, we must necessarily keep in mind the congressional recognition of the right of free expression. § 8(c), 29 U.S.C.A. § 158(c); N. L. R. B. v. Transport Clearings, Inc., 5 Cir., 1963, 311 F.2d 519, 523.

■ Nor can we find any discriminatory purpose or effect in the Employer's mailing a tear sheet from a local newspaper which included an advertisement under the sponsorship of the "Dalton Boosters." There is no evidence that the Employer either solicited, encouraged, participated in, or made any contribution of any kind toward the preparation or publication of this ad. Conceding that readers might well have in mind that it was directed to the employees of the Employer in connection with the impending election, it was an appeal by the community, not this Employer. It pointed out what the economic consequence in payrolls was from the closing of a mill in an adjacent county. It contrasted that county's situation with the growth of textile and apparel workers' payrolls in the County in which the Dalton plant was located. It made no reference to the Union election. Its final plea was "keep industry growing—and in Dalton."

Conceding that readers might well have assumed that this concerned the impending election at the Employer's Dalton plant, there is certainly nothing coercive or threatening about the advertisement itself. We do not see how the Employer's sending a copy of it to the employees could make it mean more than it did when it was first published. Nor is there any indication at all in this record that any one of the employees learned of the advertisement solely through the copy mailed to him by the Employer.

■■ For all the record shows, each of the employees either had read, or had heard or know of, the advertisement before receiving the tear sheet copy from

the Employer. In the battle of the pamphlets, the campaign barrage of material, the literature and writings, this was but a new form for the company's consistent, and permissible, contention that its unusual costs of handling goods posed the hazard of the plant being closed if Union demands made it economically impossible for the company to compete in the market. Neither standing alone, nor as a piece of literature sent by the Employer, can we find any seeds of discriminatory motive here. That is what is required. N. L. R. B. v. W. L. Rives Co., 5 Cir., 1961, 288 F.2d 511, 516; N. L. R. B. v. Dalton Brick & Tile Corp., 5 Cir., 1962, 301 F.2d 886, 897; Local 357, International Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. N. L. R. B., 1961, 365 U.S. 667, 677, 81 S.Ct. 835, 840, 6 L.Ed.2d 11, 19 (concurring opinion).

It follows, therefore, that with respect to both these mailings, the order cannot be enforced.

Enforced in part; enforcement denied in part.