**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CACTUS PETROLEUM, INC., Respondent.**

**No. 21961.**

United States Court of Appeals Fifth Circuit.

Feb. 2, 1966.

---

Marcel Mallet-Prevost, Asst. Gen. Counsel, William J. Avrutis, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Elliott Moore, Atty., N.L.R.B., Washington, D. C., for petitioner.

Willis Witt, Charles Sapp, Liddell, Austin, Dawson & Sapp, Houston, Tex., for respondent.

Before TUTTLE, Chief Judge, COLEMAN, Circuit Judge, and HUNTER, District Judge.

HUNTER, District Judge.

The Board seeks enforcement of its decision and order, 134 NLRB 1254,[1]

---

[1] The parties went to trial on September 27, 1960. On November 18th, the Trial Examiner issued his Intermediate Report and Recommended Order, recommending that the complaint be dismissed in its entirety. On December 14, 1961, more than a year later, the Board issued its decision and order. On or about November 1, 1960, respondent sold its physical assets to Permian Corp., and was thereafter dissolved. In 1963 the Board reopened the case and Permian entered in-

to an agreement with the union and the Board, whereby Permian agreed to reemploy the strikers. On January 13, 1964, the Board issued a Back Pay Specification and Notice of Hearing. The parties have stipulated as to the amount of back pay respondent would owe if, and only if, this Court decrees enforcement of the back pay provisions of the Board's 1961 decision. On September 30, 1964, the Board requested enforcement.

holding that the employer had violated Section 8(a) (5) and (1) by bad faith refusal to recognize the union as bargaining agent, Section 8(a)(3) and (1), by discriminatory discharge and refusal to reinstate 14 unfair labor practice strikers and Section 8(a)(1) by making coercive remarks to employees.

The organizational activity actually began on June 29, 1960, when Union Business Agent McCarthy met with a group of the Company's employees. Two days later the union claimed to have obtained authorization cards from 23 of the Company's 36 Terminal employees. Later that day, however, an employee named Marksberry withdrew his designation leaving 22 designations as of this date. This same day, McCarthy spoke to Curry, a Company dispatcher, and told him that the union represented a majority of the employees. On July 4th, McCarthy called on Covington (the Terminal Manager) and informed him that the union "represented the Cactus Terminal employees at Spearman." McCarthy made a formal request for recognition. Covington replied that he had no authority, but would refer the matter to Company President York. McCarthy then handed Covington a letter addressed to the company which read:

"July 1, 1960 [2]

"Cactus Petroleum Inc.
Spearman, Texas
Att: Mr. W. D. York

(r) Mr. Aubrey Covington

Dear Sir:

I take this means of notifying you that your non-supervisory employees of the Cactus Petroleum Inc. in and around Spearman have affiliated with this Local Union and the International Union of Operating Engineers, AFL–CIO. I am requesting your recognition of said organization for the purpose of collective bargaining within the meaning of the National Labor Relations Act.

If such recognition is refused, I shall petition the National Labor Relations Board for a election and certification thru that agency. In the meantime we shall look upon any change in policy toward employees or change in employee personnel from the stand point of whether or not such changes may be made for the purpose of intimidating, coercing, or otherwise influencing the employees in their choice or determination to bargain collectively.

Trusting that I shall hear from you at your earliest convenience, I am

Yours truly,

(Signed) L. V. McCARTHY
L. V. McCARTHY
Business Representative

cc: N.L.R.B.
File

LVM:ph"

On July 5th two additional Terminal employees effectively withdrew their union designations. This admittedly left the union with only 19 of the 36 employees.[3] On July 6th, McCarthy called York in Houston, advising him that the union represented a majority of the employees. York expressed his unfamiliarity with the question of recognition and asked McCarthy to explain the procedures involved. McCarthy told York that if he, York, did not think the union was supported by a majority of the workers, that "there was a course to take to get a petition or something before the National Labor Relations Board," and then if he had a majority they would direct an election. McCarthy admits that York suggested sending a petition to the NLRB to determine the question of majority and that he, McCarthy, replied "I am in the process of doing that." York told McCarthy that as soon as he received the letter handed to Covington on July 4th that he would answer it. On this same date, July 6th, two more terminal em-

2. Although the letter bore the date "July 1, 1960" the testimony shows that it was not handed to Covington until July 4th.

3. One card, that of Ross Rogers, is immaterial, because he had been lawfully discharged. The Trial Examiner and the Board both found that this was so.

ployees withdrew their union designations. The union then had only 17 of the 36 employees. On July 8th, York answered McCarthy's letter, stating:

"CACTUS PETROLEUM, INC."
"Houston 17, Texas"
"P. O. Box 12385
Telephone MIssion 4–5151"
"July 8, 1960"
"Mr. L. V. McCarthy
International Union of Operating Engineers
Local 351
111 East Coolidge
Borger, Texas

Dear Mr. McCarthy:

I have received your letter dated July 1, 1960, addressed to Cactus at Spearman, Texas, relating to negotiations which you want to conduct for the Cactus employees.

As I told you on the telephone, I am not very familiar with matters of this kind, but after talking to several of the people in my organization, I have come to the conclusion that most of the men working for Cactus are not interested in a Union, and I do not want to be in a position of forcing them into a Union against their will, but I can certainly assure you that if any Cactus man desires to join a Union, I will not hold it against him.

Sincerely yours,
(Signed) W. D. YORK
W. D. York"

Meanwhile, on July 7th, McCarthy and a committee of three union members had called on Covington, demanding recognition. Covington told the committee that York was in the process of answering. Later this same day, fourteen employees called a protest strike of the Company's "alleged refusal to recognize the union." Covington requested that the strikers return to work, and when this offer was refused, he filled the strikers' positions with 14 replacements.

The Trial Examiner issued an Intermediate Report and Recommended Order, recommending that the complaint be dismissed in its entirety. The Board disagreed, and found that the Company had refused to bargain with the Union when it represented a majority of the employees so that the Company had violated Section 8(a) (5) and (1) of the Act. The Board further found that the Company was under a duty to reinstate, and that its refusal to do so was a violation of Sections 8(a) (3) and (1). The Board also concluded that in the context of the employer's other unlawful conduct (the refusal to bargain) the remarks of one Smotherman were coercive and violative of Section 8(a) (1).

*Our task is complicated somewhat by the fact that the Board's order directly contravened the decision of the Trial Examiner.* We look to the Supreme Court for guidance and find the following:[4]

"The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case. To give it this significance does not seem to us materially more difficult than to heed the other factors which in sum determine whether evidence is 'substantial.'" 340 U.S. 474, 496–497, 71 S.Ct. 456, 469, 95 L.Ed. 456.

## THE REFUSAL TO BARGAIN

■■ The Union made a demand for recognition and bargaining status on July 4th by delivering a letter to Covington

4. Universal Camera Corp. v. National Labor Relations Board (1951).

and orally requesting recognition. This request was repeated over the telephone to York on July 6th, and at the meeting in Covington's office on July 7th. Covington did not refuse to recognize the union on July 4th. To the contrary, he told McCarthy that he had no objection to the union and that he would refer the matter to York. York did not, on July 6th, refuse to bargain. An uncoerced majority is a prerequisite to recognition. Surely, the employer is not charged with clairvoyance in being able to make an immediate decision whether or not there is a majority. He was under no obligation to accord "telephonic recognition" then and there. When was recognition refused? The evidence is uncontradicted that York thought the matter was going to be decided by Board election and certainly McCarthy gave him every reason to believe this in the conversation of July 6th. York did refuse to recognize the Union on July 8th, and he did so by formal letter, stating that he did not believe that they represented a majority of the employees. Covington refused on July 7th under circumstances heretofore revealed. There is no serious quarrel with the finding of the examiner that the Union made a demand on July 4th, and that the demand, if it ever was rejected, was not rejected until July 7th, but the Board takes the position that it was not necessary to decide whether the Union had majority status on July 7th, because the shift in membership was brought about by unfair labor practices of the employer. The Board has a duty to show a causal connection between the employer's alleged unfair labor practices and events which it contends were due to such practices. Winter Garden Citrus Products Co-op. v. NLRB, 238 F.2d 128 (5th Cir.). The record is devoid of any evidence showing that the dissipation of the Union majority can be attributed to any act of the employer. Surely, the remarks of Smotherman, who was at best a minor supervisory employee, to Kilpatrick and Ledford were not related to the Union's loss of majority.[5] Kilpatrick and Ledford were members of the Union and remained so. There is not a trace of any of the asserted coercive promises, and if these two conversations had any effect on anyone, there is no evidence of it. The employees who withdrew categorically testified that the Company made no effort to coerce, influence or threaten them. Miller's testimony is typical:

"Q. I would like to ask you if Cactus Petroleum advised you to get out of the Union?

"A. They did not.

"Q. Did they offer you a better job or an increase in pay or anything to get out of the Union?

"A. They did not.

"Q. Did they put any pressure on you to get out of the Union?

"A. No sir, it was quite the other way."

Neither do we think that these conversations of Smotherman with Kilpatrick and Ledford constitute an 8(a)(1) violation.[6] The remarks were mild in nature and did not "coerce," "restrain," or "interfere with" the rights of a single employee. The statements were manifestly no more than a pronouncement that in Smotherman's opinion the men should talk to York, and contained no discernible or implied threat of reprisal. Neither standing alone nor in a concept of totality can we find any coercion.[7]

---

5. The conversation with Brewer, excluded as an unfair labor charge, could not have contributed to the loss of majority, it occurred several days after the strike.

6. Section 8(a)(1) provides:
"(a) It shall be an unfair labor practice for an employer—
"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by section [7] of this title * * *."

7. The conversation with Ledford was sought by Ledford. Previously, Ledford had tried to talk with Smotherman about the union and Smotherman had said he would rather not discuss it. On the second occasion, however, Smotherman did advise Ledford that York, when he had

■ It is important when, in assaying the legality of words spoken or written, that we keep in mind the congressional recognition of the right of free expression. 29 U.S.C.A. 158(c); NLRB v. Transport Clearings, Inc., 311 F.2d 519 (5th Cir. 1963); NLRB v. Collins and Aikman Corp., 338 F.2d 743 (5th Cir 1964). What we said in Texas Industries, Inc. v. NLRB, 336 F.2d 128, (5th Cir. 1964), is equally applicable here:

"It is well settled that under § 8 (c) the employer must be regarded as a rightful contestant for his employees' loyalty in a union election. This section permits an employer to state his legal rights under the Act * * *. It is only when the employer goes further and threatens to himself take economic or other reprisals against the employees that a § 8(a) (1) violation may be found."

■■ By brief the Board argues that the "unjustified withholding of requested recognition in itself causes employee support to waiver and depart." There is logic in that statement, but the defect in this reasoning is that it assumes an illegal refusal. It ignores completely the fact that at the time of the refusal the Union did not have majority status.[8] But, even if the Union had represented a numerical majority of the employees at the time of the refusal to bargain, we could not share the Board's finding that the record in its totality supports a determination that the Company violated Section 8(a)(5) of the Act. The Board concedes that where, at the time request for recognition is made the employer has a

good faith doubt of the Union's majority, it may refuse the union request for recognition without violating the Act. NLRB v. Dan River Mills, Inc., 274 F.2d 381 (5th Cir. 1960); NLRB v. Bedford-Nugent Corp., 317 F.2d 861 (7th Cir. 1963). The only limitation on this right is that there be a good faith doubt on the part of the employer; that is, the employer may not merely use its denial of recognition as a subterfuge for delay or to gain time in which to undermine the union or dissipate its majority. Skyline Homes, Inc. v. NLRB, 323 F.2d 642 (5th Cir. 1963). There is nothing in this record to show bad faith. To the contrary, it reveals good faith. The evidence is uncontradicted that York had reason to believe the issue of "majority" was to be determined by Board election. It was not the action of the employer, but rather that of the Union, which resulted in an election not being held. Not more than three days expired between the date the Union made its demand and the date when the Company, with no anti-union history, experienced a minority strike. No offer was made to tender proof of majority. York, on July 8th, wrote a letter in which he questioned the majority, and he, like Covington, made it clear that no one would suffer any discrimination of any kind for having supported or not supported the Union. The record considered as a whole reveals the combination of factors heretofore cited, all of which leads us to the conclusion that under the facts and circumstances presented there is no substantial evidence to deprive the employer of a cloak of reasonableness and good faith.

time, would be willing to meet with the men individually. Ledford testified unequivocally that he received no promise of any benefit and that he was not coerced in any way. The Kilpatrick incident was more or less in the same vein and involved a casual and friendly conversation during which Smotherman suggested that Kilpatrick and the men talk to York concerning their problems. Kilpatrick refused.

8. Parenthetically, it should be noted that the Company's position is that there was

never an uncoerced majority. This position is premised on the testimony of five (5) employees that they would not have signed cards except that the Union told them that all or a majority of the employees had signed authorization cards. We agree with the Board's rejection of this testimony on the basis that the testimony of the signers as to their subjective state of mind at the time of signing did not here operate to overcome the effect of their overt action in signing.

### THE BOARD'S FINDING THAT THE COMPANY FIRED AND RE- FUSED TO REINSTATE STRIK- ING EMPLOYEES

■■ It is clear that the sole reason and occasion for this strike was the refusal to bargain with the Union. Although a minority strike is not unlawful per se, it is nevertheless unprotected activity, for participation in which an employee may be permanently discharged. NLRB v. Draper Corporation, 145 F.2d 199, 156 A.L.R. 989 (4th Cir. 1944); NLRB v. Brashear Freight Lines, Inc., 119 F.2d 379 (8th Cir. 1941). If the application seems harsh in the instant case, it is only fair to point out that the consequences could have been avoided by resort to Board procedures for determining the issue which occasioned the strike.

For reasons stated, a decree enforcing the Board's order will be, and the same is hereby denied. Enforcement denied.