**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FINESILVER MANUFACTURING COMPANY, Respondent (two cases).**

**Nos. 24830, 25070.**

United States Court of Appeals
Fifth Circuit.

Sept. 20, 1968.

---

22.  See Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 660 (1966).

Marcel Mallet-Prevost, Asst. Gen. Counsel, NLRB, Hans J. Lehman, Atty., NLRB, Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Paul J. Spielberg, Edith Nash, Attys., N.L.R.B., for petitioner.

Allen P. Schoolfield, Jr., Schoolfield & Smith, Dallas, Tex., Paul M. Green, Dalton Cross, San Antonio, Tex., for respondent.

Before THORNBERRY and SIMPSON, Circuit Judges, and ATKINS, District Judge.

THORNBERRY, Circuit Judge:

In these consolidated appeals, the National Labor Relations Board petitions this Court, pursuant to Section 10(e) of the National Labor Relations Act (29 U.S.C. § 151 et seq.), for enforcement of orders against Respondent, Finesilver Manufacturing Company of San Antonio, Texas. The orders were designed to remedy numerous violations of section 8(a) (1) of the Act and the discharges of eight employees in violation of section 8(a) (3). Except for the order that employee Felipa Palacios be reinstated with backpay, we enforce.

The findings of interference with the rights of self-organization, i. e., the violations of section 8(a) (1), were based largely on the testimony of employees as to interrogation, surveillance, and other forms of veiled or blatant coercion. While much of this testimony was disputed, the trial examiner and the Board made credibility determinations in favor of the employees which we, according to our usual practice, must accept. NLRB v. Monroe Auto Equipment Co., 5th Cir. 1968, 392 F.2d 559. Having accepted these credibility determinations, we hold that substantial evidence supports all the 8(a) (1) violations found. Discussion of the individual findings is wholly unnecessary except for the finding that a certain notice posted by the company was coercive. On September 21, 1965, after having learned on the previous day that the union was gaining strength, respondent posted on its bulletin board and enclosed in the pay envelopes of all employees the following notice:

1. The union says the signing of cards will be confidential.

The TRUTH:

ANY EMPLOYEE WHO SIGNS A CARD FOR A UNION MAY BE CALLED UPON TO TESTIFY IN

OPEN COURT UNDER A SUB-
POENA.

COMMENT:

The best way to avoid this is to stay
away from union meetings, and then
you can't be forced to sign cards.
NO ONE HAS TO SIGN A CARD
OR ANYTHING ELSE.

2. The union says this company can't
close down.

The TRUTH:

WE DO NOT INTEND TO CLOSE
DOWN UNLESS WE HAVE TO.
HOWEVER, THE SUPREME
COURT OF THE UNITED
STATES HAS SAID THAT ANY
COMPANY CAN CLOSE DOWN
COMPLETELY FOR ANY REA-
SON AT ALL REGARDLESS OF A
UNION.

COMMENT:

This company will continue to run
its own business, union or no union,
strike or no strike.

The company argues that the proposi-
tions stated are legally correct and that
a notice which simply tells employees the
truth should not constitute an unfair
labor practice. Whether they be legally
correct or not, however, the statements
have unlawfully coercive implications,
especially when considered in the con-
text of the company's widespread pattern
of antiunion conduct. See NLRB v.
Griggs Equipment, Inc., 5th Cir. 1962,
307 F.2d 275, 278. Taking the first
proposition, we see no reason for inform-
ing employees that they might be re-
quired to testify in open court other than
to let them know that the names of union
adherents could be ascertained and ap-
propriate reprisals taken. As for the
statement that a company can close down
completely for any reason at all, we need
only look to the Supreme Court decision
which established that proposition for
confirmation of the rule that an employ-
er cannot interfere with organization ac-

tivities by *threatening* to close the plant.
Textile Workers Union of America v.
Darlington Mfg. Co., 1965, 380 U.S.
263, 274, 85 S.Ct. 994, 1001, 13 L.Ed.2d
827, n. 20; see Carolina Mirror Corp.,
1959, 123 N.L.R.B. 1712; Newton Co.,
1955, 112 N.L.R.B. 465; cf. Collins &
Aikman Corp., 1963, 143 N.L.R.B. 15,
enforced in part, 5th Cir. 1964, 338 F.2d
743. Considering the statement in the
context of the antiunion hostility, we
believe it constituted an unlawful threat
to close the plant in the event of a union
victory.

The discriminatory discharges will be
considered individually though most of
the Board's findings are based on credi-
bility determinations which we accept.

*Elisa Moreno.* The Board found that
this woman's discharge was intended by
the company as a warning that it could
use its economic power to defeat union-
ism. While there is no direct evidence
that she was fired for union activity, we
sustain the Board's inference that she
was on the basis of her allegiance to the
union,[1] of which the company had knowl-
edge, and also the background of anti-
union animus and widespread pattern of
antiunion conduct on the part of the com-
pany. See Schwob Mfg. Co. v. NLRB,
5th Cir. 1962, 297 F.2d 864, 868.

The company contends that Moreno
was fired for excessive absenteeism.
From 1958 to 1965, she worked at creas-
ing flaps to be attached to the backs of
pants pockets and was considered so pro-
ficient that her absenteeism was tolerat-
ed. However, when this job was phased
out in 1965, the company says it could
not justify retraining her for another
spot in light of her miserable attendance
record. The Board answers that she
could do and had done other kinds of
work and that her absenteeism had al-
ways been tolerated because of her skill.
Moreover, it argues that the company has
a policy of tolerating the frequent ab-
sences of the many women who work in

[1.] Moreno does not appear to have been a leading union activist, but she signed a union authorization card and in September, 1965 she threatened to report to a union business agent her dissatisfaction with being moved so often from job to job.

the plant. As there is no evidence that her attendance record was worse than average, we must agree with the Board that the reason advanced by the company for discharging her does not withstand scrutiny.

*Gilbert Perez.* The Board found that Perez was fired because of his membership on the union organizing committee. It emphasizes Perez' undisputed testimony that two days after the company learned of his membership on this committee Hertzel Finesilver told him, "I'm going to wait for you to make just one mistake and then I am going to fire you." The Company, on the other hand, argues that he continually made errors in his job of order filling and that after having received a final warning about making mistakes, he was fired for erroneously filling a J. C. Penney order. The company makes a persuasive case for the point that Perez was inordinately careless, but the Board found that he was not the one who filled the J. C. Penney order which supposedly brought about his discharge. The company's argument to the contrary is also persuasive, but we must defer to the Board's assessment of the conflicting testimony. At any rate, the official warnings received by Perez against union activity and in particular the warning he received from Hertzel Finesilver two days after joining the organizing committee will support a finding that he would not have been fired but for his union activity. See Mel Croan Motors, Inc., v. NLRB, 5th Cir. 1968, 395 F.2d 154, 155. The company's side of the story represents, at best, a "fairly conflicting view" which we are not at liberty to accept as against the Board's decision though we might justifiably have made a different choice had the matter been before us de novo. NLRB v. Monroe Auto Equipment Co., supra; NLRB v. Certain-Teed Products Corp., 5th Cir. 1968, 387 F.2d 639.

*Gilbert T. Palacios and Vito Fabian.* Palacios and Fabian got into a heated argument during working hours with employee Gonzalez whom they accused of being a company informer. Gonzalez and Fabian scuffled briefly before being separated and sent back to their machines. Shortly thereafter, Gonzalez advanced on Palacios who in turn pulled a knife out of his pocket. They were separated before either was hurt. According to Mervin Finesilver's testimony, all three were summoned to his office; Gonzalez reported and was reprimanded, but Palacios and Fabian did not show up. When he found them in the plant, they greeted him with obscene words and said they were quitting. One supervisor and one rank-and-file employee corroborated this version of events. The examiner and the Board, however, accepted the testimony that Finesilver came to Palacios and Fabian and told them they were fired for fighting with Gonzalez. It was concluded that the reason given was pretextual and that they were really fired for union activity. Both were union activists and had been interrogated by company officials in a coercive manner.

The question of whether the two employees quit or were fired involves a credibility determination by the Board which we accept. Having affirmed the finding that they were discharged, we must also agree that the fight cannot withstand scrutiny as a reason for discharging them because Gonzalez, who was friendly to management, was not fired. Since Gonzalez was not fired, it can reasonably be inferred that Palacios and Fabian would not have been treated differently but for their known allegiance to the union.[2]

*Elena and Abelardo Hernandez.* The company contends that Elena Hernandez was fired for threatening employees with physical injury if they did not join the union, but the Board found she was discharged for being a union activist. One

2. Palacios' case might be considered distinguishable because he threatened Gonzalez with a deadly weapon, but there is evidence that Gonzalez, as the stronger man and the aggressor, was equally to blame for the temporary breakdown of order.

of the employees who supposedly reported that she had been threatened denied on the witness stand ever having made such a report or ever having been threatened. Another employee testified that she had been threatened, but her testimony was discredited. Having no reason to overturn the Board's assessment of the testimony, we affirm the finding that Elena Hernandez was the victim of a discriminatory discharge.

The same disposition must follow for her husband, Abelardo Hernandez. He, like his wife, was a union activist and had been coercively interrogated by officials concerning that activity. The company's position is that he quit in protest over his wife's discharge, but the Board found that he was fired after protesting and that his protest was a mere pretext for getting rid of a union activist. The Board's finding is supported by substantial evidence.

*Mary Ramos.* This employee's case is much like Elisa Moreno's. The company contends that Mary Ramos was discharged for excessive absenteeism, but the Board found that her absenteeism had always been tolerated and became intolerable only when the company learned she was a union activist. No evidence was introduced to show that her attendance record was substandard. We have no difficulty requiring her reinstatement because in this instance there is some direct evidence of an antiunion motive: The examiner credited her testimony that at the time she was fired Supervisor Taylor indicated that she was being fired for pushing union cards.

*Felipa Palacios.* On the day Felipa Palacios was fired, there was a scuffle between two other women in her work area. Hertzel Finesilver, while walking through the area to restore order, told Felipa to "keep out of it" or "keep your mouth shut" or something to that effect. After he left, she began walking through the plant telling people that Hertzel had threatened her. Supervisor Taylor reported this to Finesilver, who instructed Taylor to send the woman to the first-floor office. When she absolutely refused to obey this instruction, she was fired. She testified, and the Board found, that she was genuinely afraid to confront Finesilver in the first-floor office as opposed to the second-floor office. The Board also found that the discharge for refusal to obey was pretextual and that she was really fired for union activity. The examiner, on the other hand, found that she was fired for just cause. He said Felipa "had placed herself in an untenable position with respect to Taylor, in the presence of other employees, when she refused to go to the employer's office."

The testimony is conflicting and confusing as to why Palacios refused to go to the first-floor office. Without analyzing it in detail, we state two conclusions from our reading of the record: First, the examiner did not believe and we do not believe she disobeyed Taylor's order because she was in fear of bodily harm;[3] second, the examiner found no evidence and we find no evidence that Taylor had an antiunion motive at the time he confronted her, i. e., that he was trying to force her to disobey an order so that he could be rid of a union activist. On the basis of these evidentiary conclusions, we have reached the decision that Felipa Palacios was not justified in disobeying the order and that Taylor fired her for the single reason that she defied him in the presence of other employees. If any semblance of

---

3. Her testimony that she would have been willing to go to the second-floor office as opposed to the first-floor office belies any testimony that she feared for her physical safety. Her position was apparently based on a warning by her husband that men in the plant made jokes about female employees who went to the first-floor office. We think she was either acting in response to her husband's warning or simply being defiant. There is no evidence that either Hertzel Finesilver or Taylor knew that Gilbert Palacios had warned his wife against going to the first-floor office. Thus, they could not have known that they might force her to disobey an order.

plant discipline is to be maintained, an employee cannot ordinarily be selective in the matter of obeying a supervisor's instructions. If instructions are flagrantly disobeyed, the employee is properly discharged. See NLRB v. Great Dane Trailers, Inc., 5th Cir. 1968, 396 F.2d 769. In this instance, we believe the discharge was for cause and that the Board has acted on no more than a suspicion of a discriminatory discharge. There being no more than a suspicion to support the Board's decision, we need not approve it. See Cramco, Inc. v. NLRB, 5th Cir. 1968, 399 F.2d 1; NLRB v. O. A. Fuller Super Markets, Inc., 5th Cir. 1967, 374 F.2d 197. Enforcement of that part of the order which requires Felipa Palacios' reinstatement with backpay is denied.

Enforced in part; denied in part.