**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BIG THREE INDUSTRIAL GAS & EQUIPMENT CO., Respondent.**

**No. 30416.**

United States' Court of Appeals, Fifth Circuit.

April 30, 1971.

Rehearing Denied and Rehearing En Banc Denied July 6, 1971.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Clifford Potter, Director, N. L. R. B., Houston, Tex., Avrum M. Goldberg, N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Herman M. Levy, Atty., N. L. R. B., for petitioner.

Charles R. Vickery, Jr., Vickery, McConnell & Rowland, Houston, Tex., for respondent, Big Three Industrial Gas & Equipment Co.

Before SKELTON,* Judge and MORGAN and CLARK, Circuit Judges.

PER CURIAM:

This matter is before us on petition of the National Labor Relations Board to enforce its order that Respondent, Big Three Industrial Gas & Equipment Company (Company), cease and desist from engaging in certain unfair labor practices. This application for enforcement followed the Board's finding that the Company had twice violated the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. (1965). First, § 8(a) (1) of the Act had allegedly been transgressed by posting a letter which stated that wages and other working conditions would be frozen for an indefinite period because the Union had filed an election petition. Second, the Company had disregarded § 8(a) (1) and (3) by refusing to permit two employees to work on the day of the election because they were Union observers. We determine as a matter of law, that the posted letter correctly stated the applicable law. We find no evidentiary support in the record to show general coercion or discrimination with respect to the alleged refusal of work. The loss to the two individuals is simply too inconsequential to justify setting an otherwise valid election aside. We deny enforcement.

Twenty days after the International Union of District 50, United Mine Workers of America (Union) filed an election petition, the Union distributed a letter to all employees. In form, it was addressed to the Company's president. This letter suggested that a meeting be held on increasing the employees' wages while the certification matter was pending before the Board. That the letter was intended to be and was campaign propaganda was made amply clear, not only by its public distribution, but also by the large block letter printing across the bottom which read:

"HOW LONG MUST WE WAIT FOR A WAGE INCREASE?"

The Company replied to the Union and posted its reply on the employee bulletin board. This Company response is the basis of the Board's finding that the Company violated § 8(a) (1) of the Act. The allegedly coercive language of the

---

* Honorable Byron G. Skelton, U. S. Court of Claims, sitting by designation.

Company letter reads, in pertinent part, as follows:

As your letter indicates, it is true that the election petition of the union has frozen the wages and all other terms and conditions of employment at the Big Three West 11th Street Plant for an indefinite time.

The Board's finding that the Company had discriminated against certain Union employees because of their Union activities, grew out of the selection of Union election observers. The evidence indicated that although the Board gave the names of the two employees who were to serve as Union observers to the Company, it never responded to the Company's requests for the times when these two men wished to be off duty. The Company contended that it needed to know definitely what time the men were to be off in order to meet production schedules. When this information was not supplied by the day before election, the plant superintendent called the two men into his office and advised them that since they would be working at the election there would be no need for them to come to work the next day. He added that the Union would probably pay for the lost time. The two employees agreed to this arrangement. That night, after talking with the Union representative, the two men changed their minds and reported to work the morning of the election at 6:00 A.M. as usual. At approximately 8:30 A.M., the plant superintendent observed the men at work and, after a minor squabble, told them to punch out. Although these two Union employees were not permitted to do any further work on election day, the employees who were to serve as Company observers worked the full morning of the election. Both Union employees participated in the preelection conference, voted in the election and were paid for the time they actually worked on the morning of the election.

The Union lost the election by a vote of 87 to 57. The Union challenged 95 votes. Without any charge from the Union, the Board on its own motion, charged that by posting the letter the Company had interfered with, restrained and coerced its employees in violation of § 8(a)(1) of the Act. It further charged that the Company violated § 8(a)(1) and (3) of the Act by refusing to permit the two Union observers to work the day of the election.

After a hearing on these two charges, the Trial Examiner determined that posting the letter had had a restraining and coercive effect during the preelection period. For this reason, the trial examiner recommended that the election be set aside. As to the refusal of the Company to permit the two employees to work on election day, the Trial Examiner, while finding the disparate treatment between the Company and the Union observers was inherently discriminatory, concluded that it could not be determined, apart from speculation, that any other employees overheard the plant superintendent tell the Union observers to quit work or knew the reason for their departure. He therefore did not recommend any § 8(a)(1) or (3) relief on this basis.

The Company duly filed exceptions to the Trial Examiner's decision and requested a hearing before the Board. The Board, in its decision, affirmed the decision of the Trial Examiner with respect to the allegedly coercive letter, but reversed the Trial Examiner's ruling as to the employees and declared that the refusal to permit them to work constituted a violation of both § 8(a)(1) and (3). The usual § 10(c) order was entered and this enforcement proceeding resulted.

## I. THE LETTER

The Board contends that the Company letter is an attempt by an employer to influence his employees' choice by withholding benefits while a representation election is pending. The Board contends that the language in the letter wrongfully eliminated any expectancy of wage increases. This elimination of expectancy was allegedly produced in two ways. First, the letter misinformed the employees with respect to the law by stating that the Union's petition to the

Board prevented employee wage increases. Second, it implied that a rejection of the Union in the election could quickly free the Company to grant raises and other benefits. From these premises the Board reasons the employees were led to conclude that a penalty was attached to the exercise of their rights in choosing a bargaining representative.

The Company asserts a number of reasons why the letter should not constitute an unfair labor practice. First, the Union, which has as much expertise in the labor field as the Board, did not regard the letter as an unfair labor practice. Second, the letter had been provoked by the initial piece of campaign propaganda contained in the Union letter. Third, since it could not have lawfully granted a wage increase during the organizational drive, the Company should not be penalized for announcing that fact.

■ Our determination that the letter, when correctly interpreted, fairly and correctly stated the law applicable in the instant situation, compels us to hold that the letter did not constitute an unfair labor practice and the Board was in error in so holding. It is not disputed that the Company's letter was written in response to the Union's campaign propaganda letter, which, as we have noted, ended with the prominently featured question, "HOW MUCH LONGER MUST WE WAIT FOR A WAGE INCREASE?" The Company was certainly entitled to respond. While its letter might have been more artfully drawn if it was intended as an abstract legal analysis, this was neither its setting nor its purpose. Just as the Union's opening epistle, it was really directed to the electorate. The question was: How much longer must we wait for a wage increase? The answer was: "[T]he election petition of the Union has frozen the wages and all other terms and conditions of employment * * * for an indefinite time."

The issue confronting the Court sharpens to determining the meaning and construction that should be given to the Company's use of the word "frozen". The Board interpreted "frozen" as a coercive threat to withhold from the employees wage increases that otherwise would have been forthcoming. This the Board reasons amounted to announcing a change in policy. The Board hypothesizes that there would have been a wage increase had the Union not been in the picture and had the election not been pending. The basis for the Board's inference that the employees could reasonably have expected their employer to make some wage increase is that such a course was dictated by the prevailing economic conditions. Not only is the record devoid of any proof that a wage increase was planned or that the company granted periodic wage increases, but it is also completely barren of any factual support that economic conditions—either in the nation or within the Company—were such as would have normally dictated a wage increase. Without such a factual basis, the Board's finding that there would have been a wage increase is untenable. Without evidence to show a wage increase could be anticipated but for the election campaign, there is no basis for the inference that the Company was announcing a *change in existing policy* by stating that wages would be frozen. The record is equally devoid of any proof that the Board's interpretation of the letter was the meaning given to it by the electorate. Interpretations of the written word are questions of law, which this court is as capable of making as is the Board. Our differing legal interpretation of the Company's letter does not constitute the rejection of a factual determination of the Board.

■ In assaying the legality of words spoken or written in connection with a union campaign, the language should neither be isolated nor analyzed in a vacuum, but must be considered in the light of the surrounding circumstances in which it was written. N.L.R.B. v. Collins & Aikman Corp., 338 F.2d 743 (5th Cir. 1964). The Union asked how much longer employees would have to wait for

a wage increase; the Company indicated that the filing of an election petition immobilized the Company—no new conditions could be introduced. When "frozen" is read in this light, it becomes apparent that the Company's letter indicated that it was doing no more than it was required to do. N.L.R.B. v. Dothan Eagle, Inc., 434 F.2d 93 (5th Cir. 1970).

## II. THE EMPLOYEES

The Board found that Big Three had violated §§ 8(a) (1) and (3) by refusing to permit two Union election observers to work on the day of the election and by refusing to pay them for the time lost. The Board rejected two determinations made by the Trial Examiner. First, the Board reversed the Trial Examiner's finding that there was insufficient evidence to support a finding that the Company's activity with respect to the two employees had constituted an independent violation of § 8(a) (1). Second, the Board jettisoned the Examiner's determination that although the disparate treatment between the Company and Union observers was inherently discriminatory, the loss of 3 or 4 hours of work did not constitute a violation of § 8(a) (3) of sufficient magnitude to warrant the issuance of a Board order.

■ As to the § 8(a) (1) coercion charge, the Trial Examiner pointed out that there was no proof, apart from the speculative testimony of the two employees involved, that any employees overheard their conversation with the plant superintendent or knew the reason for their departure. He further pointed out that these men did participate in the pre-election conference and both did act as election observers. There was no credible evidence showing that the Company's activity destroyed laboratory conditions by interfering with, restraining, or coercing employees in general. The inferences drawn by the Board from the two employees' Union activity and the treatment they received from the Company simply do not rise to the level of substantial evidence. In the face of the contrary fact determinations and credi-

bility findings of the Trial Examiner, we reject this Board determination. Dryden Manufacturing Co. v. N.L.R.B., 421 F.2d 267 (5th Cir. 1970).

■ As to the § 8(a) (3) findings that the Company discriminated in regard to the terms or conditions of employment so as to discourage membership in the Union, we again disagree with the Board. However, we need not consider the correctness of either the Trial Examiner's or the Board's determination that the practice was inherently discriminatory, since we readily agree with the Trial Examiner that a loss of 3 or 4 hours pay by two employees did not warrant the issuance of the Board's order.

The maxim *de minimis non curat lex* is well known in the law and stands for the proposition that courts do not care for trifles. This rede is particularly applicable to the instant situation. The loss by two employees of a few dollars pay is simply too picayune to warrant setting aside a long and costly election process involving hundreds of voters or, indeed, even to warrant a cease and desist and back pay order for the men involved. Conceding arguendo, that the Company's practice was discriminatory, it would be such a rank unfairness to the remaining electors and so clearly beneath the dignity of the Board's function, that we hold this triviality could not support any order.

Enforcement denied.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

### PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.