**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**O. A. FULLER SUPER MARKETS, INC., Respondent.**

No. 23072.

United States Court of Appeals
Fifth Circuit.
March 8, 1967.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Malcolm D. Schultz, Atty., N.L.R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Gary Green, Herbert Bernhardt, Attys., N.L. R.B., for petitioner.

C. Allen High, Nashville, Tenn., for respondent.

Before TUTTLE, Chief Judge, and THORNBERRY and GOLDBERG, Circuit Judges.

THORNBERRY, Circuit Judge:

The National Labor Relations Board seeks enforcement of an order based upon a finding that respondent, O. A. Fuller Super Markets, Inc., violated sections 8 (a) (1) and 8(a) (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a) (1), (a) (3). Early in 1964, two unions made efforts to organize the employees at respondent's supermarket in Tuscumbia, Alabama. By February 10, 1964, eleven of the supermarket's fourteen employees had signed union authorization cards. Davis, the store manager, had been informed of this fact and had been given copies of the cards. On May 9, 1964, store manager Davis discharged Larry Lewis, a checker employed by the supermarket since the early part of 1963, who had been one of the eleven employees to sign union cards. On June 22, 1964, in response to charges filed by the interested unions, a complaint was issued alleging that respondent had violated section 8(a) (3) of the Act by discharging Lewis because of union activity. The complaint also charged that respondent had violated section 8(a) (1) by acts of interrogation and intimidation of other employees concerning their union activities.

Following a hearing conducted on September 11, 1964, the trial examiner concluded that respondent had not violated the Act in either respect. On April 29, 1965, however, the Board reversed the trial examiner's conclusions and ruled that respondent had violated both sections 8(a) (1) and 8(a) (3). The Board accordingly ordered respondent to cease and desist from discouraging union membership and activities among its employees by means of interrogation, discrimination, and coercion. In addition, respondent was ordered to offer Lewis, the discharged employee, reinstatement

with back pay. After careful review of the entire record upon which the Board bases its order, we are unable to conclude that there is substantial evidence to support either unfair labor practice determination, and we therefore deny enforcement.

I. *The Section 8(a) (3) Violation.*

 Here, as in all controversies involving judicial review of administrative determinations, we begin with the premise that the Board's decision must be sustained if supported by substantial evidence on the record considered as a whole. NLRB v. Brown, 1965, 380 U.S. 278, 291, 85 S.Ct. 980, 983, 13 L.Ed.2d 839, 849; Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Accordingly, if the Board's determination is based upon such relevant evidence as a reasonable mind might accept as adequate to support it, we are not at liberty to deny enforcement simply because the evidence may also reasonably support other conclusions or because we might justifiably have reached a different conclusion had the matter come before us *de novo*. NLRB v. Camco, Inc., 5th Cir. 1966, 369 F.2d 125. This "limited" scope of review does not, however, require us to abdicate our responsibility to the extent of merely "rubberstamping" our affirmance of the Board's decision when, after full review of the record, including the evidence opposed to the Board's views, we are unable conscientiously to conclude that the evidence supporting such decision is substantial. Universal Camera Corp. v. NLRB, supra, 340 U.S. at 488, 71 S.Ct. at 465, 95 L.Ed. at 467; see NLRB v. Brown, supra, 380 U.S. at 291, 85 S.Ct. at 988, 13 L.Ed.2d at 849. To justify enforcement of an order of the Board the evidence must do more than merely create a suspicion of the existence of facts upon which the order is based; indeed, a discriminatory act on the part of the employer is not in itself unlawful

unless intended to prejudice an employee's position because of his union activity, i. e., some element of antiunion animus is necessary. See Radio Officers' Union, etc. v. NLRB, 1954, 347 U.S. 17, 42–44, 74 S.Ct. 323, 337, 98 L.Ed. 455, 478–479. Thus, in controversies involving employee discharges, the motive of the employer is the controlling factor, NLRB v. Brown, supra, 380 U.S. at 287, 85 S.Ct. at 985–986, 13 L. Ed.2d at 846, and, absent a showing of antiunion motivation, an employer may discharge an employee for a good reason, a bad reason, or for no reason at all. NLRB v. I. V. Sutphin, Co-Atlanta, Inc., 5th Cir., February 8, 1967, 373 F.2d 890; NLRB v. Longhorn Transfer Serv., Inc., 5th Cir. 1965, 346 F.2d 1003, 1006. If the specific employee happens to be both inefficient and engaged in union activities, that coincidence standing alone is insufficient to destroy the just cause for his discharge. NLRB v. Soft Water Laundry, Inc., 5th Cir. 1965, 346 F.2d 930, 934. Only if the Board adequately sustains its burden of producing evidence on the record as a whole which establishes a reasonable inference of causal connection between the employer's antiunion motivation and the employee's discharge can its order properly be enforced.[1] See NLRB v. Soft Water Laundry, Inc., supra, 346 F.2d at 936; Schwob Mfg. Co. v. NLRB, 5th Cir. 1962, 297 F.2d 864, 868. With these necessarily subjective guidelines before us, we turn to the facts underlying Lewis' discharge to ascertain whether the Board's finding of antiunion motivation is supported by substantial evidence on the record as a whole.

 Whether or not there exists a background of antiunion animus or a widespread pattern of antiunion conduct represents a significant consideration where the true motivation of the employer is ambiguous. Schwob Mfg. Co. v. NLRB, supra, 297 F.2d at 868. Here, the record

[1]. Of course, once this burden is met, the unfair labor practice finding of the Board must be sustained even though a valid ground for dismissal may have also existed. E. g., NLRB v. Longhorn Transfer Serv., Inc., supra, 346 F.2d at 1006; NLRB v. Linda Jo Shoe Co., 5th Cir. 1962, 307 F.2d 355, 357.

fails to disclose any labor difficulties between the employer and its employees prior to the occurrence at issue. Eleven of the supermarket's fourteen employees had signed union authorization cards approximately three months prior to Lewis' discharge and there is no evidence that anyone had suffered adverse consequences as a result of such union activity. Moreover, there is no indication that Lewis assumed any substantial role in furtherance of union organizational attempts.[2] On the other hand, there is abundant evidence that Lewis was a less than satisfactory employee. Store manager Davis testified that Lewis was the "sorriest employee" he had ever had, and that he would have discharged him earlier were it not for fear that such action might have appeared motivated by antiunion sentiment. Davis further testified that he had reprimanded Lewis on previous occasions concerning eating, smoking, and excessive talking and whispering in the check-out area, and, above all, concerning his discourtesy toward customers.[3] In addition to the testimony of Davis two other employees testified that Lewis had been discourteous to customers on numerous occasions.[4]

 In opposition to the foregoing evidence, the Board apparently rests its entire case upon one statement made by Davis to Lewis on the date of his discharge. On May 9, 1964, Davis called Lewis into a backroom shortly before he was scheduled to leave work for the day and, according to the testimony of Lewis, the following colloquy transpired:

> So, I went to the backroom and he told me, he says, 'Larry, this hasn't got anything to do with the Union, but I am going to have to let you go,' and I asked him 'Why?' and he said, that first of all, I was politicking for the Union, which was against Company policy, and he said I was smoking, drinking, eating, behind the check-out in the check-out lanes, and I wasn't courteous to customers, and my check-out lane was pretty dirty from stomping cigarettes on the floor.

Joint Appendix, p. 6. Davis admitted that "politicking in the check-out lane" was one of the reasons he had given Lewis for his discharge. In its decision and order reversing the trial examiner's determination that no unfair labor practice had been established, the Board accepted the single statement relating to "politicking for the Union" at face value, apparently disregarding all remaining evidence bearing upon the unsatisfactory work of Lewis. We cannot conclude, in light of the evidence in its entirety, that the Board was justified in removing this statement from its factual context in order to reasonably infer that Lewis' discharge was motivated by a desire to "encourage or discourage [union] membership by means of discrimination." Radio Officers' Union, etc., v. NLRB, supra, 347 U.S. at 42, 74 S.Ct. at 337,

---

2. While the record does indicate that Lewis indulged in an excessive amount of "whispering" in the checkout area which store manager Davis assumed concerned the union, such conduct does not appear to have differed from that engaged in by other employees in the relatively informal atmosphere of the supermarket.

3. Lewis himself admitted that he had been reprimanded for sitting on the checkout stand with his feet on a garbage can two weeks after he and ten other employees had signed union cards, and that at that time Davis had informed him he was the sorriest employee he had ever had. Lewis' uncooperative attitude is further exemplified by his remark to a fellow employee afer Davis had instructed him to do some-

thing that after the union came in he would tell Davis what to do. Joint Appendix, pp. 11, 36.

4. While the record clearly indicates that discipline at the supermarket was less than Spartan, and that it was not uncommon for employees to eat and smoke in the checkout area with the knowledge of store manager Davis despite written rules forbidding such practices, there is absolutely no evidence that any employee other than Lewis had been discourteous toward customers. As the trial examiner concluded, "What might be overlooked in others could trigger the discharge of one who has seriously or more frequently transgressed." Record, p. 54.

98 L.Ed. at 478. To be sure, the inarticulate choice of words employed by Davis in enumerating the reasons for Lewis' discharge, when viewed apart from the record as a whole, does appear to represent direct evidence of antiunion motivation. We may not, however, rest our determination of the substantiality of evidence solely upon those facts which serve to justify the Board's decision, but must properly take into account all contradictory evidence as well as evidence from which conflicting inferences may be drawn. Universal Camera Corp. v. NLRB, supra, 340 U.S. at 487–488, 71 S.Ct. at 464, 95 L.Ed. at 467. Therefore, in addition to the evidence relating to Lewis' inferior work, we deem it appropriate to consider the contrary conclusions reached by the trial examiner with regard to Davis' statement. We recognize, of course, that the substantial evidence standard is in no way modified when the Board and its trial examiner disagree. Nevertheless, the Supreme Court has observed:

[E]vidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion.

Id. at 496, 71 S.Ct. at 469, 95 L.Ed. at 472.

In passing upon the proper weight to be accorded the statement made by Davis, the trial examiner concluded:

As we weigh all the facts and weigh the credibility of the various witnesses, I am impressed by Davis' statement that he objected because Lewis was blocking the checkout lane, although he did not say that, and charged him with politicking in the lane. While Davis' words would support a finding of discriminatory discharge, it appears from the entire testimony that he merely used the wrong words in suggesting one reason when he was in fact, as the evidence clearly indicates, motivated by another, i. e., Lewis' attitude as manifested by his discourtesy. Lew-

is' whispering and presumed union talk, or his union activity generally does not appear to have been different from that engaged in by other employees and, at the moment, by whichever employee had joined him in any given circumstances.

Davis' naive reference to politicking, which would generally determine the issue against the Company, is here overcome by his credited explanation and by consideration of the attendant circumstances. We have in this case a "pretext" situation in reverse. What appears on its face or *per se* to be an admission against interest was credibly explained by Davis. While recognizing Davis' remark when he had sufficient valid reason for the discharge, I emphasize two other facts: his apparent acceptance of the union activities of the other employees for several months without animus and the limited extent of Lewis' union activities.

Record, pp. 56–57. The Board, on the other hand, concluded that Davis' choice of words manifested that Lewis' union activity was a "substantial * * * motivating reason" for his discharge, and that there was therefore no need "to consider whether any of the multitude of other reasons advanced by Davis for Lewis' discharge, including discourtesy, were in fact involved in the decision to discharge Lewis." We conclude that the Board acted unreasonably in so divorcing itself from the factual context before it. In light of the totality of circumstances evidenced by the record as a whole, it simply cannot reasonably be concluded that Davis' reference to "politicking for the Union" represented more than an inarticulate attempt to express dissatisfaction with Lewis' excessive talking and whispering in the check-out lanes, no matter what might have been the subject of such conversations. This conclusion is reinforced by the fact that Davis was careful to preface his remarks to Lewis with the assurance that Lewis' discharge had nothing to do with union activity.

In thus finding ourselves unable to sustain the Board's determination that

Lewis' discharge represented a violation of section 8(a) (3), we are convinced that in so doing we have not transgressed the limitations placed upon our powers of review by merely displacing the Board's choice between two reasonable conflicting inferences with our own. It is sufficient to say that under the facts before us we cannot conscientiously conclude that the finding of the Board is supported by such substantial evidence as might reasonably be accepted in support of the conclusion that Lewis was discharged because of his union activity.

II. *The Section 8(a) (1) Violation.*

▋ Turning now to the finding of illegal interference and coercion, we can discover little in the record to substantiate the Board's determination. The Board in its decision referred only to one incident by which to justify its finding of unlawful interrogation. The day after store manager Davis became aware that eleven of the supermarket employees had signed union authorization cards, the following exchange allegedly occurred between Davis and Johnson, one of the eleven employees:

Q All right. Now, what did Mr. Davis say to you, and what did you say to him, if anything?

A He said, "I see you signed the card, the Union card," and I said, "Yes sir," and he said, "I wonder who started it?" and that was all.

Q Did you say anything then?

A I just said, "Yes sir," and that is all I said.

Joint Appendix, p. 4. For interrogation which is not in itself threatening to constitute a violation of section 8(a) (1) it must meet fairly severe standards, normally including the showing of a background of employer discrimination and a demonstration that the circumstances of the interrogation would reasonably induce fear of reprisal. See NLRB v. Ritchie Mfg. Co., 8th Cir. 1965, 354 F.2d 90; NLRB v. D'Armigene, Inc., 2d Cir. 1965, 353 F.2d 406; NLRB v. McGahey, 5th Cir. 1957, 233 F.2d 406. Each case must therefore necessarily be evaluated in its own factual context, with due consideration being given to the time, place, and manner in which the disputed inquiries were made. NLRB v. Lexington Chair Co., 4th Cir. 1966, 361 F.2d 283; NLRB v. Camco, Inc., 5th Cir. 1965, 340 F.2d 803, cert. denied, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339. Looking to the facts of this controversy, we find absolutely no evidence of a history of employer hostility or discrimination against union activity. There is, moreover, a pronounced absence of any established pattern of employee interrogation. Here, the questioner, store manager Davis, worked side by side with the small group of employees and, as demonstrated by the record as a whole, an atmosphere of marked informality pervaded their relations. Under these circumstances, it would be unreasonable to infer that Davis' remark to Johnson carried with it an implied threat of reprisal. We are therefore unable to conclude that Davis' isolated inquiry represented the degree of interference, restraint, or coercion of employee organizational rights necessary to substantiate the Board's finding of a section 8(a) (1) violation. See NLRB v. Camco, Inc., supra; NLRB v. Hill & Hill Truck Line, Inc., 5th Cir. 1959, 266 F.2d 883. Accordingly, the Board's petition for enforcement of its order is hereby

Denied.