**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**RED TOP CAB & BAGGAGE CO. et al.,
Respondents.**

No. 21316.

United States Court of Appeals
Fifth Circuit.

Oct. 6, 1967.

**·548**

---

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Melvin H. Reifin, Atty., NLRB, Washington, D.C., for petitioner.

R. M. MacArthur, Herbert B. Mintz, Miami, Fla., for respondents.

Before BROWN, Chief Judge, JONES, Circuit Judge, and BREWSTER, District Judge.

BREWSTER, District Judge:

The National Labor Relations Board petitions for enforcement of its order of February 3, 1964, requiring the respondents, Yellow Cab System, Yellow Cab Company of Miami, Red Top Cab & Baggage Co., B. & S. Taxi Corp., and Checker Cab Operators, Inc., to cease and desist from interfering with certain concerted activities of their employees for mutual aid or protection found to be subject to Section 7 of the Act, and to redress the injury found to have been done to cab driver, John Kurtz, by restoring him to eligibility for employment as a driver and reimbursing him for earnings lost by reason of his discharge on account of such activities.[1]

This controversy had its source in a dispute between certain Yellow Cab System taxicab drivers, including Kurtz, and the men at the Miami International Airport known as "starters", who were jointly paid by Yellow Cab System and Red Top Sedan Service, Inc., to direct patrons to cabs and limousines there and to keep traffic of their vehicles flowing smoothly. Persons leaving the airport by taxicabs and limousines were serviced exclusively by Yellow Cab and Red Top Sedan under separate taxi and limousine franchises issued by the Dade County Port Authority. Yellow Cab had the taxi franchise, and Red Top Sedan, the one for the limousines. The cab drivers claimed that the starters were steering passengers to the limousines without asking them whether they wanted a limousine or a cab, and that the starters signalled for a cab only if the patron asked for one on his own initiative or if the waiting limousines were loaded. Red Top Sedan is not a party to this proceeding.

Kurtz was the only charging party before the Board. His original complaint was against Red Top Cab, only, for discrimination against him in regard to hire and tenure, "because of membership and activities in behalf of International Taxi-Owners and Drivers Association, Inc., a labor organization." Kurtz later filed an amended charge naming all of the present respondents as his joint employers, and giving as an additional reason for the claimed discrimination against him that "he was engaged in concerted activities for the purpose of collective bargaining or other mutual aid or protection." The same attorney represented him in filing each of the charges.

There was never any truth in the charges about the alleged labor organization or the collective bargaining. The

[1]. The Board's decision and order are reported at 145 NLRB No. 138.

"labor organization" never became or acted as the bargaining agent for anyone. It never made any effort to comply with any of the requirements imposed by the NLRB or by the State of Florida on unions seeking to qualify as bargaining agents. It was only a corporation chartered and promoted by Kurtz to help him in his fight to terminate the exclusive taxi franchise at the airport. It faded out of the picture when it developed on the hearing that it had not even come into existence until some time after Kurtz' discharge.[2] About half the respondents' drivers were members of the Teamster's Union, and none of them was making any complaint.

The decision of the Board in favor of Kurtz was predicated entirely upon his charge that the respondents fired him because of his participation in concerted activities for mutual aid or protection within the purview of Section 7 of the Act. In so deciding, the Board rejected the respondents' contentions that (1) the requisite relationship of employment or control of Kurtz by them did not exist; (2) Kurtz was not engaged in concerted activities within the meaning of Section 7; (3) Kurtz' discharge was for legal reasons and not for participation in protected concerted activities.

The last two contentions are embraced in the first question the Board's brief says we are called upon to decide: "Whether substantial evidence on the record as a whole supports the Board's finding that respondents caused the termination of John Kurtz because he had engaged in concerted protected activity." Our conclusion that the record as a whole establishes that Kurtz lost his job as a cab driver for legal reasons, and not on account of any unlawful motivation, makes it unnecessary for us to decide the troublesome question of whether there existed the necessary employer-employee relationship between respondents and Kurtz, or control by respondents over him, to make them liable in this proceeding. There will, then, be no effort to present all the material facts showing both sides of that issue; but a summary of the evidence necessary to evaluate the questions concerning Kurtz' activities and the reasons for his discharge requires some consideration of the nature of the respondents' business operations and Kurtz' relation thereto.

The Miami International Airport was under the general management and operation of the Dade County Port Authority, which was an arm of the Dade County Commission. The thirteen members of the Commission were elected by the voters, and they made up the membership of the Port Authority. While any taxicab was allowed to bring passengers to the airport, only cabs and limousines operated by a company having a franchise were allowed to pick up passengers there. The taxi franchise guaranteed an annual payment of at least $100,000.00 to the Port Authority. The franchise also provided certain obligations, rules and regulations the taxi company had to meet, such as furnishing constant, adequate taxi service at the airport, instruct-

2. The findings and conclusions in the trial examiner's Intermediate Report and Recommended Order adopted by the Board contained the following:

"The authorization he procured on April 24 were the nucleus for the formation of the Association, for which he filed the articles of incorporation on June 5, and its purpose is stated in part II above. Kurtz' termination was effectuated before the incorporation papers of the Association were filed, and in the later described conversations of Respondents' officials with the owner-drivers concerning Kurtz' activities, the Association was not mentioned. Hence, the specific question of whether it is a labor organization is not here reached. We merely recite Kurtz' activities on behalf of the Association to complete the narrative of events."

\* \* \*

"Kurtz' activities in forming and re-sponsoring the Association as such did not contribute to his termination. Accordingly, the matter of whether it is a labor organization has not been reached and has not been passed upon. The same applies to whether Respondent's conduct also violated Section 8(a) (3) of the Act."

ing each of its taxi drivers as to the method and procedure used at the airport, maintaining its vehicles and other equipment "in clean, first class, operable condition", and *"efficient and courteous service to the public"*, and controlling *"the conduct, demeanor and appearance of its officers, employees, agents, and representatives."* (Emphasis added.) The cab company posted a substantial bond to guarantee compliance with its obligations.

It required more than a franchise, however, for taxicab and limousine companies to pick up patrons desiring their services at the airport. A carrier under contract with a public authority of the State of Florida or any political subdivision thereof having jurisdiction over airports, seaports, etc., was required to have a certificate issued by the Florida Railroad and Public Utility Commission qualifying it to act as such contract carrier. Also, while taxicabs operating in Dade County could discharge passengers at any point therein, no passenger could be picked up in any incorporated area in the County except by a taxicab operating under a permit issued by the municipality where the pickup was made.

Red Top Cab and Red Top Sedan had met all the necessary qualifications for serving the airport under their respective franchises since 1949.

All of the respondents except the Yellow Cab System were corporations. "Yellow Cab System" was the trade name for the business operation that coordinated the activities of all the cabs belonging to respondent corporations through centralized management and operating facilities. The three Segal brothers and their father owned a majority of the voting stock in four of the five taxi corporations that made up the Yellow Cab System at the time of the hearing before the Board. They had started into the taxicab business in Miami and its environs with the acquisition of the Yellow Cab Company of Miami, which held ninety-five taxi permits from that city. Subsequent acquisitions of the corporate stock of Red Top Cab &

Baggage Co., Checker Cab Operators, Inc., and B. & S. Taxi Corp., gave them control of over two hundred taxi permits from Miami by 1959. They had been owners of Red Top Sedan Service, Inc., the limousine corporation, since prior to 1949. All the taxis of the above named companies were the same color as those operated under the municipal permits issued to Yellow Cab Company of Miami, and they operated as "Yellow Cabs". The limousine service was not operated as a part of the Yellow Cab System; but both the System and Red Top Sedan shared in the payment of salaries of the starters at the airport, as they served passengers wanting either Yellow Cabs or limousines.

In 1959, the Segals adopted a ten year plan of liquidation of their interests in the cab companies by conversion to an arrangement for ownership by their employees. Under the plan, any rank and file employee could purchase one or more shares of stock in the Segal taxi corporation of his choosing. The transaction was usually handled through an installment note and a conditional sales contract secured by a pledge of the stock and the other items received by the buyer. His purchase of stock in any of the taxi corporations entitled him to share in all the benefits of the Yellow Cab System, including the airport taxi franchise, operating headquarters and garage maintenance, advertising, telephone, two-way radio, traffic control and dispatching service, fleet prices and liability insurance, use of Yellow Cab stands, and operation generally as a Yellow Cab. Each share of stock purchased entitled him to use one of the Miami municipal taxi permits and to the privilege of picking up passengers at the airport under the taxi franchise of Red Top Cab. One hundred sixty-one such permits went to rank and file employee-purchasers. Forty-one of the remaining permits were assigned to the Big Ten Taxi Corp., organized so that the supervisory employees of the taxi corporations could also share in the Segal's plan to sell their taxi business to the employees.

The stock purchaser bought his own cab. He made his own decision on whether to obtain it through the Yellow Cab System or from some other source. He could drive the cab himself, hire a driver for one shift or drivers for shifts around the clock, or lease it as long as the driver conformed to the rules and regulations of the System. He could operate his cab as many or as few hours as he desired. He selected, employed, and paid his own drivers. It was to the advantage of the owners to obtain their public liability insurance through the Yellow Cab System under a blanket policy. For that reason, drivers had to be qualified and to pass visibility and brake reactions tests given by the agent at headquarters having supervision of insurance; and they were subject to veto by the System if they were deemed unfit or undesirable. The contract under which the stock was bought required the purchaser to abide by the uniform rules and regulations adopted by the Policy Board of that System. The purpose of such requirement, among other things, was to protect the franchise, the taxi permits and to "project the proper public image."

The contract under which an employee bought into the System provided that if the purchaser violated any of the rules and regulations of the System, he would be notified of such violation and given a specified period in which to make corrections. If he failed to make them, his contract could be matured and his rights thereunder forfeited.

The conversion plan called for the Segals to retain a majority of the stock in each taxi corporation until their interests therein were liquidated. The board of directors of each of the corporations was composed of the four Segals and three of the owner-operators. The composite group of all such directors, together with one owner from Big Ten Taxi, made up the Policy Board that ran Yellow Cab System. The result of such arrangement was that the rank and file owner-operators had nine representatives on the Policy Board; the Segals,

four; and the supervisory employees who organized the Big Ten Taxi, one. It is undisputed that the Segals were inactive as members of the Policy Board, and that its decisions were made by its owner-operator members.

There is no claim that the conversion arrangement was a sham to cover up an actual employer-employee relationship. The Segals had been fortunate enough financially that they felt they could get by without all the headaches that went with the operation of over two hundred taxis and the supervision of hundreds of cab drivers. They made it possible for this lucrative Yellow Cab business to be acquired by the employees who had served them, on terms that they could pay. They retained right of control only to the extent and for the time necessary to protect the business they had built up until the purchasers paid them for it. As a practical matter, the management of the cab business was actually turned over to the owner-operators, through the Policy Board, so as to free the Segals from the responsibilities involved in such management.

The Policy Board was the governing authority of the Yellow Cab System. It met regularly, and established rules and regulations for the System. Those included the rules and regulations imposed by the airport and municipal authorities in connection with the franchise and tax permits. The operating expenses of the Yellow Cab System were paid out of a fund made up from regular, periodical contributions of the taxi owners. The Policy Board decided the amount of the payment necessary to defray those expenses.

While matters of the nature that would ordinarily arise out of employment of a cab driver were handled between the owner-operator and his driver, the operation of all the taxis as part of the Yellow Cab System made it necessary to have some provision for judging and controlling the conduct of drivers that affected the System as a whole. For that purpose, the Policy Board set up a body known as the "trial committee," which

was composed of either three or four members of the Policy Board and was in fact a subcommittee of it. The trial committee held hearings, after notice, on all disciplinary matters, and made recommendations to the Policy Board for action to be taken for misconduct of the owner-operators or their drivers. During all of the period here involved, all of the members of the trial committee were owner-operators.

Kurtz had been a sheet metal worker before he began driving for one of the cab owners in the Yellow Cab System in the early part of 1961. He worked as driver for different owners in the System over the sixteen month period that ended in June, 1962. He was active on the side of the taxi owners and drivers in the controversy over the pickup patronage at the airport. His zeal soon turned to vengeance against the System, and he was devoting his efforts to trying to do irreparable injury to the business of the System while he was employed and working as a car driver in it. He indulged in a protracted course of conduct involving continued, flagrant violation of the rules and regulations of the System and of the taxi franchise, boisterous haranguing with other persons working in the System, loud and vulgar vituperation and abuse of cab owners and other drivers while on the job, constant friction with fellow workers, and efforts to bring about the loss of the taxi and limousine franchises. These matters will be discussed later in more detail. Cab owners and drivers began to complain seriously about his conduct and tactics, even though they had as much or more interest than Kurtz in seeing that the taxis got their share of the business at the airport. A grievance lodged against him with the Policy Board was referred to the trial committee. That committee, after a hearing, reached the decision that he was an unfit employee for the System, and recommended that he be discharged and blacklisted on the System's employment records. The Policy Board adopted the recommendation. There is no indication in the evidence

that there was any dissent among the members of the committee or the Policy Board over this decision, although all of those participating in the meeting were taxi owners wanting to get at least as much as their share of the patronage at the airport. A notation was made on Kurtz' employment card that he was an agitator and an unfit person for employment in the System. His cab owner-employer was notified of the action, and he discharged him. The Policy Board, upon recommendation of the trial committee, blacklisted fourteen other drivers and required them to be dismissed at the same meeting when it took action against Kurtz. None of those drivers made any claim that his termination was due to protected concerted activities. As might be expected in an organization as large as the Yellow Cab System, composed largely of the type of persons who drive cabs, Kurtz had his friends among some of the owners and drivers. He got a job with another cab owner in the System shortly after his first discharge; and that employer got the same instructions from the Policy Board and took the same action as in Kurtz' first employment. The process of hiring and firing was repeated until he had been employed and discharged by five different owners. The record does not disclose whether the various owners had knowledge of the Policy Board's decision of unfitness when they employed Kurtz. Finally, however, to make sure that owner-operators had notice of the Policy Board's decision of unfitness of any driver, that Board adopted a resolution requiring cab owners to clear prospective drivers with the System radio room in advance of employment to determine whether they had been declared unfit to drive. After such action, there was no re-employment of Kurtz.

Both phases of the Labor Board's order will stand or fall on whether its finding that the discharge of Kurtz was unlawfully motivated is supported by substantial evidence, as the termination of Kurtz' employment is the only basis given by the Board for its cease and de-

sist order as well as for its order to reinstate Kurtz with back pay.[3]

29 U.S.C.A. § 160(e) provides the following limitation on the scope of judicial review of the findings of the Labor Board: " * * * The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. * * * " The landmark case interpreting this provision of the statute is Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The recent case of NLRB v. O. A. Fuller Super Markets, Inc., 5 Cir., 374 F.2d 197, 200 (1967) summarizes the guidelines for determining the existence of substantial evidence laid down by the Supreme Court in the *Universal Camera Corp.* case and applied in numerous subsequent decisions.[4] In that case Judge Thornberry, speaking for this Court, said:

"Here, as in all controversies involving judicial review of administrative determinations, we begin with the premise that the Board's decision must be sustained if supported by substantial evidence on the record considered as a whole. NLRB v. Brown, 1965, 380 U.S. 278, 291, 85 S.Ct. 980, 983, 13 L.Ed.2d 839, 849; Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 96 L.Ed. 456. Accordingly, if the Board's determination is based upon such relevant evidence as a reasonable mind might accept as adequate to support it, we are not at liberty to deny enforcement simply because the evidence may also reasonably support other conclusions or because we might justifiably have reached a different conclusion had the matter come before us *de novo*. NLRB v. Camco, Inc., 5th Cir. 1966, 369 F.2d 125. This 'limited' scope of review does not, however, require us to abdicate our responsibility to the extent of merely 'rubber-stamping' our affirmance of the Board's decision when, after full review of the record, including the evidence opposed to the Board's views, we are unable conscientiously to conclude that the evidence supporting such decision is substantial. Universal Camera Corp. v. NLRB, supra, 340 U.S. at 488, 71 S.Ct. at 465, 95 L.Ed. at 467; see NLRB v. Brown, supra, 380 U.S. at 291, 85 S.Ct. at 988, 13 L.Ed. 2d at 849. To justify enforcement of an order of the Board the evidence must do more than merely create a suspicion of the existence of facts upon which the order is based; indeed, a discriminatory act on the part of the employer is not in itself unlawful unless intended to prejudice an employee's position because of his union activity, i. e., some element of anti-union animus is necessary. See Radio Officers' Union etc. v. NLRB, 1954, 347 U.S. 17, 42–44, 74 S.Ct. 323, 337, 98 L.Ed. 455, 478–479. Thus, in con-

---

3. The findings, conclusions and recommendations of the trial examiner adopted by the Board included the following:
   "For all of the above reasons, I find and conclude that all who actually drive cabs in Respondents' operation, whether owners or nonowners, are employees within the meaning of the Act. Hence, by discriminating against Kurtz in reprisal for exercising his rights under Section 7, Respondents in violation of Section 8(a) (1) interfered with, restrained, and coerced all such employees in the exercise of those rights."
   The following is quoted from the decision and order of the Board itself:
   " * * * Accordingly, we find, as did the Trial Examiner, that by terminating or causing the termination of Kurtz' employment for the reason states, Respondents interfered with, restrained, and coerced him and other drivers in the exercise of rights guaranteed in Section 7 of the Act, thereby violating Section 8(a) (1)."

4. Some of those cases by this Court, in addition to those cited in the quotation from the *Fuller Super Market* case, are: The Great Atlantic and Pacific Tea Co., Inc. v. NLRB, 5 Cir., 354 F.2d 707 (1966); NLRB v. Cactus Petroleum, Inc., 5 Cir., 355 F.2d 755 (1966); NLRB v. Big Three Welding Equipment Company, 5 Cir., 359 F.2d 77 (1966); NLRB v. Brennans, Inc., 5 Cir., 366 F.2d 560 (1966), rehearing denied, 5 Cir. 368 F.2d 1004.

troversies involving employee discharges, the motive of the employer is the controlling factor, NLRB v. Brown, supra, 380 U.S. at 287, 85 S.Ct. at 985–986, 13 L.Ed.2d at 846, and, absent a showing of antiunion motivation, an employer may discharge an employee for a good reason, a bad reason, or for no reason at all. NLRB v. I. V. Sutphin, Co-Atlanta, Inc., 5th Cir., February 8, 1967, 373 F.2d 890; NLRB v. Longhorn Transfer Serv. Inc., 5th Cir., 1965, 346 F.2d 1003, 1006. If the specific employee happens to be both inefficient and engaged in union activities, that coincidence standing alone is insufficient to destroy the just cause for his discharge. NLRB v. Soft Water Laundry Inc., 5th Cir., 1965, 346 F.2d 930, 934. Only if the Board adequately sustains its burden of producing evidence on the record as a whole which establishes a reasonable inference of causal connection between the employer's antiunion motivation and the employee's discharge can its order properly be enforced. See NLRB v. Soft Water Laundry, Inc., supra, 346 F.2d at 936; Schwob Mfg. Co. v. NLRB, 5th Cir., 1962, 297 F.2d 864, 868. With these necessarily subjective guidelines before us, we turn to the facts underlying Lewis' discharge to ascertain whether the Board's finding of antiunion motivation is supported by substantial evidence on the record as a whole."

The *Universal Camera Corp.* case holds specifically that the reviewing court must not confine itself to consideration of evidence "which, when viewed in isolation", supports the Board's findings,[5] but must also take "into account contradictory evidence or evidence from which conflicting inferences could be drawn."[6] The Court adds: " * * * The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. * * * "[7]

We have carefully reviewed the record as a whole; and, after applying the guidelines set out in the cases cited, we have come to the conclusion that the Labor Board's finding that Kurtz' employment was terminated on account of protected concerted activities is not supported by substantial evidence. It could be that certain evidence, viewed in isolation, would support the finding; but in the light of the totality of the circumstances shown by the record as a whole, the only possible reasonable conclusion is that Kurtz was legally discharged for insubordination, constant friction on the job with cab owners and drivers, disloyalty and a continual course of conduct on the job detrimental to the public image and business interests of the Yellow Cab System.[8]

The lengthy record of the evidence makes it impossible to discuss the misconduct of Kurtz in detail. Suffice it to say that he openly and continually fla-

5. 340 U.S., at 478, 71 S.Ct., at 459.

6. 340 U.S., at 487, 71 S.Ct., at 464.

7. 340 U.S., at 488, 71 S.Ct., at 464.

8. All of these grounds have been consistently recognized as justification for discharge of an employee, where they were the real motivation, even in the face of coincident protected activities. Farmers Co-Operative Co. v. NLRB, 8 Cir., 1953, 208 F.2d 296, 303 (insubordination, cursing employer); NLRB v. American Thread Co., 5 Cir., 1954, 210 F.2d 381, 383 (open and continuous insubordination, disobedience of orders); Ridge Growers, Inc. v. NLRB, 5 Cir., 1954, 211 F.2d 752, 756 (disrespectful conduct towards other employees on the job); NLRB v. Blue Bell, Inc., 5 Cir., 1955, 219 F.2d 796 (violation of company rules and disrespectful conduct towards other employees); NLRB v. Soft Water Laundry, Inc., 5 Cir., 1965, 346 F.2d 930, 934 (loud, profane and obscene vituperation of employer); NLRB v. Brennan's, Inc., 5 Cir., 1966, supra, note 4 (profane, vulgar language near employers' customers and breach of company policy); NLRB v. I. V. Sutphin Co.-Atlanta, Inc., 5 Cir., 1967, 373 F.2d 890 (agitating trouble with other employees on job); NLRB v. O. A. Fuller Super Markets, Inc., 5 Cir., 1967, 374 F.2d 197 (discourtesy towards employer and open defiance of his lawful authority).

grantly violated the regulations of the System by refusing to abide by the alternate day rule at the airport,[9] by leaving his cab when it was in line to pick up passengers on the ramp at the airport,[10] by carrying political advertising on his cab and putting similar stickers on other cabs. He also advocated to other drivers that they did not have to abide by the rules. He was guilty of using loud, foul and obscene language in vituperation of Ted Ungerman, an owner-driver, while both were on the job at the airport.[11] Kurtz said it occurred near the parking lot, while Ungerman testified that it was on the ramp. In either event, it was in a public place, where is was susceptible of being heard by the public. It was of such offensive nature that it was calculated to hurt the image of Yellow Cab with any member of the public who might have heard it. Aside from that, it provoked such discord between him and Ungerman that Ungerman ran for election to the Policy Board so as better to enable him to urge the matter of Kurtz' conduct vigorously and propose sanctions for it. Kurtz was constantly in loud arguments with the dispatchers. Some of his harangues lasted as long as two hours. He constantly discussed the internal friction in the System with his passengers. All of this conduct was naturally calculated to discredit the public image of the Yellow Cab System.

On one occasion, Kurtz was called before the trial committee to answer a grievance against him. Just before the hearings started, he openly ridiculed and disparaged the members of the committee to owners and other drivers also present to answer grievances, for the purpose of creating disrespect for such members and defiance of their decisions. He refused to abide by an order of the trial committee suspending him for three days.

Kurtz teamed up with cab companies outside the Yellow Cab System who wanted the airport taxi and limousine franchises cancelled and the pickup business at the airport thrown open to all comers; and he followed a course of conduct calculated to impair the System's chances to keep the taxi franchise. He sent petitions and thousands of letters of protest to the franchising authorities at a time when applications for renewal of the franchises were pending. None of such petitions or letters was ever presented to any of the respondents. *The very attorneys who were representing the organization of taxi companies in their fight seeking such cancellations and opposing such renewals filed this charge for Kurtz before the Labor Board and actively participated in his behalf in the hearings thereon.*

We think the only possible reasonable conclusion as to the conduct of Kurtz is summarized in two statements in the testimony of Henry Storck, a cab owner, to the effect that "the man had flagrantly violated our rules and regulations", and "the man wanted things done the way he wanted to do them, and not what the rules and regulations set forth." Storck, as a partner with one other man in the ownership of thirty-seven cabs, was far more interested than Kurtz in seeing that the cabs got their share of

9. There was a time when so many of the cab drivers waited at the airport for the long haul passengers that the downtown patrons were being neglected. Upon complaint of the municipal authorities, the System corrected that condition by adopting a rule that even numbered cabs would pick up passengers at the airport on the even numbered days of the month and the odd numbered ones on the other days.

10. A certain number of cabs was allowed to line up on the ramp at the airport. Other cabs waited on the parking lot for a place in the line as cabs moved out. The drivers of the cabs in line on the ramp were required to stay with their cabs so as to keep traffic moving.

11. Kurtz did not deny this charge. His justification was that the cab drivers used profanity all the time. While one would naturally expect that cab drivers would sometimes use stronger language than "consarn" and "gracious me", foul language in public where it might be heard by potential patrons is not to be condoned. Also, profanity or lewd language used in vituperation and abuse of the employer or other employees on the job is not justified.

passengers at the airport. No reason appears why his testimony should be discredited. It is important to remember that many of the regulations flaunted by Kurtz were taken from the taxi franchise, and that violation of them endangered the franchise.

Kurtz did not indulge in this misconduct while on a strike or off the job. He was working as a driver in the System all the time. Under similar conditions, Home Beneficial Life Ins. Co. v. NLRB, 4 Cir., 159 F.2d 280, 286 (1947), said:

> "We are aware of no law or logic that gives the employee the right to work upon terms prescribed solely by him. That is plainly what was sought to be done in this instance. It is not a situation in which employees ceased to work in protest against conditions imposed by the employer, but one in which the employees sought and intended to continue work upon their own notion of the terms which should prevail. * * * We are unable to accept respondent's argument to the effect that an employee can be on a strike and at work simultaneously. We think he must be on the job subject to the authority and control of the employer, or off the job as a striker, in support of some grievance."

The trial examiner, as has been so often done in the cases cited above, gave undue significance to isolated words. He concluded that the notation, "Agitator", put on Kurtz' employment card when he was blacklisted by the Policy Board, had reference to lawful conduct in a protected concerted activity. It is more logical to say that it was fully justified by Kurtz' constant defiance of the rules, by his boisterous, improper conduct on the job, and by his advocating to owners and drivers that they did not have to observe the rules and regulations of the System. It is significant that there is no evidence that any such designation was given any of the other substantial number of owners and drivers who were active in trying to secure a change in the taxi and limousine dispatching system at the airport, and that there is no claim that any such

other persons were dismissed or disciplined for their participation in that activity.

The enforcement of the Board's order must be denied in its entirety upon our conviction, after consideration of the record as a whole, that there is no substantial evidence to show either that the conduct of the respondents was destructive of concerted activities protected by the Act, or that the termination of Kurtz' employment was unlawfully motivated.

Enforcement denied.