**SOUTHWEST LATEX CORPORATION,**
Petitioner-Cross Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent-Cross Petitioner.

No. 27649.

United States Court of Appeals, Fifth Circuit.
May 12, 1970.

Willis Witt, Houston, Tex., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Clifford Potter, N. L. R. B., Houston, Tex., John Luis Antonio de Passalacqua, Atty., N.L.R.B., Washington, D. C., for respondent.

Before THORNBERRY, DYER and CLARK, Circuit Judges.

DYER, Circuit Judge.

Petitioner Southwest Latex Corporation asks this court to review and set aside a National Labor Relations Board order which found that Southwest Latex engaged in unfair labor practices within Section 8(a) (1) of the Labor Management Relations Act, 29 U.S.C.A. § 158(a) (1), by discharging employee John Seaton and by threatening employee Loyce Osborn, and which ordered Southwest Latex to cease and desist from such unfair labor practices.[1] 175 N.L.R.B. No. 58. The Board cross-petitions for enforcement of its order. We find the Board's conclusions are not supported by substantial evidence on the record as a whole and, therefore, grant the petition to set aside and deny the cross-petition for enforcement.

---

1. Southwest Latex claims the scope of relief prescribed in the Board's order is excessively broad. In the view we take of the case this point is not reached.

*Discharge of Seaton.*

Southwest Latex is engaged in the manufacture of specialty latex products. Seaton was hired by the company in October, 1967, and was dismissed about four and one-half months later in March, 1968. According to the credited testimony of Swennes, the plant manager, and Herbeck, the foreman, Seaton was told about the Company benefits and working conditions before starting work at the plant. Nevertheless, he became a problem because, among other things, he incessantly griped and complained. During his short tenure with Southwest Latex, Seaton was formally reprimanded several times about his griping, being lax on shift duties, spending too much time on coffee breaks, and failing to keep proper log entries of the work performed on his shift. (Seaton denied receiving reprimands but the Trial Examiner credited Herbeck's and Swennes' testimony over Seaton's and the Board did not disturb this credibility determination.) It was Southwest Latex's position that all of these things contributed to the decision to discharge Seaton and that the precipitating events were Seaton's failures on February 28 and 29 to put in a full day's work and violation of the company rule to maintain a log of his activities on those days.

Herbeck had previously spoken to Seaton about his failures to make log entries and had discussed with Swennes about a month before the actual discharge the advisability of discharging Seaton. At the time, however, it was decided to give Seaton another chance since it was felt that he had the ability to do the work.

Seaton received a pay increase after three months with Southwest Latex. However, this was not, as he testified, a merit increase but an automatic increase for all employees who had been on the payroll that long.

The events of February 28 and 29 which are claimed by Southwest Latex to have precipitated Seaton's discharge begin at about 1:00 p. m. on February 28 when a reaction was initiated in a batch of latex in reactor number 2 at Southwest Latex's plant. Seaton reported to work for the third shift which began at 11:00 p. m. on that day and ended at 7:00 a. m. the morning of February 29. According to credited testimony, Seaton would know that the batch was near completion when he came on duty at 11:00 p. m. and that it was his responsibility to take a sample each hour, it being the practice of the plant to empty the reactor when the total solids content reached 46 percent and the styrene count fell below 0.6. Although the operators, such as Seaton, could make the test for the total solids content, it was the lab technician's responsibility to make the styrene test and it was the operator's responsibility to request lab assistance if it was needed. Seaton had standing instructions to call his supervisor if any problem arose on his shift or if he had any questions. Pursuant to these instructions, Seaton had, in the past, called supervisors during the night. In connection with the batch in question, however, Seaton never attempted to get the styrene tested, the lab having closed at 11:00 p. m., nor did he attempt to call his supervisor for instructions in the circumstances. Instead he permitted the batch to remain in the reactor all night. As a result, the Company lost several hours of processing time on February 29.

Herbeck arrived at work at 8:00 a. m. on February 29, an hour after Seaton's shift ended. He reviewed Seaton's log entries and found them inadequate to show what work had been accomplished the night before. It was also established that in his eight hour shift Seaton had done only three or four hours' actual work. On the night of February 29 Seaton again reported for his shift and worked until 7:00 a. m. the following morning, March 1. Seaton had left by the time Herbeck came to work at 8:00 a. m. Friday, March 1, but Herbeck noted Seaton's failure to make any entry in the log book for his activities on the preceding shift. Knowing that he would be gone when Seaton reported for work that night, Herbeck left word for Seaton to

stay over Saturday morning after 7:00 a. m. so that Herbeck could talk to him. On Saturday, March 2, Herbeck spoke to Seaton about his continual griping and complaining and about his derelictions on the night of February 28 and his failure to write anything in the log book for his shift on February 29. Herbeck also filed a formal, written reprimand dated March 2 which stated: "Spoke to J. T. Seaton about chronic griping and spending more time talking than working." The following day, Sunday, the plant was closed.

On Monday, March 4, the plant was busy with resumption of operations after the one day shutdown. Moreover, Herbeck left work a little early to attend school. Consequently, Herbeck did not speak to Swennes about Seaton until Tuesday, March 5. As a result of their discussion, Seaton was discharged on March 6.

Seaton's griping was purportedly on his own behalf. He consistently told management and supervisory employees that his gripes were his own and that he was not speaking for any of the other employees.

Seaton did meet with several other employees on February 22, though, and discussed the idea of presenting a complaint to management regarding working conditions. It was decided at the meeting to draft a letter to present to the Company and, as employee Brown put it, "Seaton sort of appointed himself as the letter writer." He showed his draft to the other employees and by March 4 received everyone's approval of the letter. He then turned it over to another employee to be typed up, following which it was the plan of the employees that each of them would sign the letter and then, as a group, meet with management to discuss it. Seaton then requested a meeting with Swennes, which was postponed until March 8 by employee Brown at Seaton's request. Although management was informed of the meeting, it is undisputed that management was never informed of the proposed purpose of the meeting. Nor was Seaton's letter ever typed up in final form, signed by the employees, or seen by management.

Employee Osborn testified that in a conversation he had with Herbeck, in which he told Herbeck that Seaton had written a letter, Herbeck said that Seaton "was possibly going to be in trouble because of the letter." Neither Osborn nor anyone else testified that Herbeck or management was told that Seaton wrote the letter on behalf of the other employees.

When Seaton was discharged on March 6 he was told by Herbeck that he had not been doing his job as expected, that he had been taking too many coffee breaks, and that he had received too many reprimands. (There were three formal, written reprimands in Seaton's file. No other employee had more than one.) As Seaton left the plant, Herbeck told him that he was sorry for discharging him but "we were all trapped into it."

Southwest Latex called a meeting of the employees on March 7 at which the employees were told that Seaton had been discharged for improper performance of duties. New wage benefits were discussed and the employees were told that they would be getting new lockers, something they had previously been attempting to obtain. No mention of the union was made at the meeting. The Board agreed with the Trial Examiner that there was nothing coercive about this meeting.

From these facts the Trial Examiner found that Seaton was discharged for cause for failure to carry out his duties and for continual griping and complaining. The Board does not disagree that Seaton was an unsatisfactory employee but it nevertheless found that he was discharged for engaging in the concerted protected activity of writing the letter on behalf of the other employees. Accordingly, it entered the order which is the subject of this review.

 In determining whether an employee has been unlawfully discharged the inquiry is whether he would have

been discharged but for his having engaged in protected activity. *E. g.*, Nix v. NLRB, 5 Cir. 1969, 418 F.2d 1001, 1005; NLRB v. Whitfield Pickle Company, 5 Cir. 1967, 374 F.2d 576, 582; Frosty Morn Meats, Inc. v. NLRB, 5 Cir. 1961, 296 F.2d 617, 621; *see* NLRB v. WTVJ, Inc., 5 Cir. 1959, 268 F.2d 346, 347. We must determine if substantial evidence on the record as a whole supports the Board's conclusion that the discharge was discriminatory. 29 U.S.C.A. § 160(e), (f); NLRB v. Brown, 1965, 380 U.S. 278, 291, 85 S.Ct. 980, 983, 13 L.Ed.2d 839, 849; Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; Nix v. NLRB, *supra*; NLRB v. Red Top Cab & Baggage Co., 5 Cir. 1967, 383 F.2d 547 (quoting NLRB v. O. A. Fuller Super Markets, Inc., 5 Cir. 1967, 374 F.2d 197, 200). The mere fact that the Trial Examiner and the Board draw conflicting inferences does not prevent the Board's inferences from being supported by substantial evidence, but is a fact which may be taken into consideration in viewing the entire record. *E. g.*, Universal Camera Corp. v. NLRB, *supra*; Nix v. NLRB, *supra*.

General Counsel's argument to sustain the Board's conclusion is, briefly stated, that: (1) Herbeck's apology to Seaton that he was sorry but "we were all trapped into it" is not the kind of statement which would be used in discharging an employee for incompetence or inefficiency, but more sensibly implies that Seaton had done the one thing—organizing his fellow employees—which made his discharge inescapable; (2) the "remarkable conjunction" between Seaton's discharge and the meeting at which management told the employees of new benefits shows unlawful motive; (3) the short, written formal reprimand of March 2 is proof of unlawful motive because it fails to mention the events of February 28 and 29, thereby showing that they were not significant to management and that these events are a pretext contrived, after the fact, to sustain the discharge; and (4) the events of February 28 and 29 cannot be looked to in order to help justify the discharge because there was no dereliction on the part of Seaton.

■■ In making each of these points General Counsel is grasping for straws which are nonexistent: (1) There was credited and uncontradicted testimony that Herbeck apologized to Seaton because it was the first time he ever had to discharge an employee and he found it a distasteful task. The Trial Examiner so found. Nevertheless, the Board found to the contrary becaue it thought such a remark "seems" to be meaningless if addressed to an employee dismissed for inefficiency. In the absence of any evidence justifying an inference to the contrary, the Board may not reject credited, sworn denials. *See* NLRB v. Whitfield Pickle Co., *supra*, 374 F.2d at 581.

■ (2) The Board placed emphasis on the fact that, at the company meeting held the day following Seaton's discharge, the other employees were told of Seaton's discharge for poor work and that a discussion of then existing and anticipated employee benefits followed. However, the Board ignored the fact that the employees themselves had requested a meeting and that meetings such as this were not uncommon between management and the employees.

■ (3) The Board said that because the written reprimand of March 2 failed to mention the incidents of February 28–29, it belied the significance placed on those events by Southwest Latex. However, there was credited and uncontradicted testimony that written reprimands are meant only to be records of the fact that the employee has been spoken to (and not summaries of the conversation) and that the oral reprimand given to Seaton by Herbeck on March 2 covered not only his continual griping and complaining but his derelictions of duty on February 28 and 29 as well.

■ (4) The reaction process should ordinarily have been completed by the time Seaton came on his shift at 11:00

p. m., February 28. The Board therefore correctly stated the question to be: whether Seaton was derelict depends upon what was expected of him in the situation he confronted. General Counsel argues that the Trial Examiner's finding that Seaton was presented with a problem which he did not undertake to solve, and for which he should have called a supervisor, is without support in the record because Seaton testified that he had been told that whenever he came on duty and there was a batch still in the reactor he was supposed to shut off the reactor and wait until the following morning for the lab personnel to check it out—*i. e.*, exactly what he did. However, this argument by General Counsel ignores the fact that the Trial Examiner expressly discredited Seaton's testimony and that the Board accepted the Trial Examiner's credibility determination. Herbeck and Swennes, whose testimony was credited, testified that Seaton knew he should have called a supervisor in the situation which confronted him when he came on his shift on February 28.[2]

◼ Apart from these minor points raised by the Board's order and by counsel for General Counsel on petition for review, the major flaw in the Board's finding that the discharge was unlawfully motivated is the lack of any substantial evidence to show that Southwest Latex had any knowledge that Seaton was engaging or purporting to engage in concerted protected activity.

◼ For a discharge to be found unlawful it must be shown that the employer knew that the employee was engaged in protected activity and that the employer fired the employee because of such activities. Indiana Gear Works v. NLRB, 7 Cir. 1967, 371 F.2d 273; NLRB v. Laney & Duke Storage Warehouse Co., 5 Cir. 1966, 369 F.2d 859; NLRB v. Redwing Carriers, Inc., 5 Cir. 1960, 284 F.2d 397; NLRB v. Ford Radio & Mica Corp., 2 Cir. 1958, 258 F.2d 457; NLRB v. Kaiser Aluminum & Chemical Corp., 9 Cir. 1954, 217 F.2d 366; NLRB v. Whitin Machine Works, 1 Cir. 1953, 204 F.2d 883. "[A]t least some legally justifiable inference of employer knowledge of a dischargee's union membership [or other protected activity] is an essential prerequisite to a valid finding of discriminatory discharge therefor." NLRB v. National Paper Co., 5 Cir. 1954, 216 F.2d 859, 862; *accord* J. C. Penney Company v. NLRB, 7 Cir. 1968, 416 F.2d 702; *see* NLRB v. Atkins Saw Division of Nicholson File Co., 5 Cir. 1968, 399 F.2d 907, 911; NLRB v. Whitfield Pickle Co., *supra*, 374 F.2d at 581.

◼ In the instant case, assuming that Seaton's self appointment as letter writer amounts to concerted activity, there is no evidence in the record to show that management or supervisory personnel knew he had so constituted himself, and therefore no evidence to show the requisite causal connection between such activity and the discharge. It is undisputed that Seaton's constant griping and complaining were solely in his own behalf[3] and that he told Herbeck and Swennes this. The letter, which the Board said was the focal point of Seaton's concerted activity, was not to be effective until signed by all the men. It

---

2. Counsel for General Counsel also argues (in accordance with the rationale taken by the Board) that Seaton was told to call supervisors only if he had any "problems" on his shift and that there is nothing in the record defining the situation which faced Seaton on his February 28–29 shift as a "problem." This is overly technical. Moreover, this argument is predicated upon Seaton's own testimony, which was discredited. Herbeck's and Swennes' credited testimony is to the effect that employees were instructed to call supervisors if they had any "questions" and that Seaton should have been aware that there was a question as to what to do about the batch which was in the reactor when he came on duty.

3. Of course, individual griping and complaining is not a protected activity. Hugh H. Wilson Corporation v. NLRB, 3 Cir. 1969, 414 F.2d 1345, 1348; Indiana Gear Works v. NLRB, 7 Cir. 1967, 371 F.2d 273, 276.

was never placed in final form, signed by the men, or presented to the company. It is true that employee Osborn told Herbeck that Seaton had written a letter and that Herbeck replied that Seaton might be in trouble as a result. It is also true that the employees requested a meeting, at which they intended to present the letter. The Board relied upon these facts, finding that Herbeck's knowledge of the fact that Seaton had written a letter was "a significant indication" of the company's knowledge of Seaton's concerted activity and that Swennes "must have been aware of the purpose of the meeting." These assumptions were made despite credited and uncontradicted testimony (some of which came from General Counsel's own witnesses) that no one ever told Herbeck, Swennes, or anyone else in the company that Seaton was representing them or what the proposed purpose of the requested meeting was, and despite denials of the company that it had any such knowledge. Herbeck's knowledge of the existence of the letter is not knowledge of the fact that it purported to be written for all the employees. The most that can be inferred from Osborn's statement to Herbeck concerning the letter and his reply is that Herbeck knew that Seaton was now putting down his own personal gripes, which theretofore had been oral, into written form. Nor can it be inferred that the company had any knowledge of the proposed purpose of the requested meeting because many such meetings had been held in the past.

 It is thus apparent that in inferring company knowledge of Seaton's concerted activity from Herbeck's knowledge that Seaton had written a letter and from the company's knowledge that the employees had requested a meeting, the Board indulged in speculation and surmise. These are not substitutes for substantial evidence. *See, e. g.,* NLRB v. Red Top Cab & Baggage Co., *supra,* 383 F.2d at 553; NLRB v. O. A. Fuller Super Markets, Inc., 5 Cir. 1967, 374 F.2d 197, 200; NLRB v. National

Paper Co., *supra.* Sworn denials of knowledge cannot be arbitrarily disregarded because of suspicion or assumption, without more. NLRB v. Whitfield Pickle Company, *supra,* 374 F.2d at 581. As this Court has stated previously in NLRB v. O. A. Fuller Super Markets, Inc., *supra:*

> To justify enforcement of an order of the Board the evidence must do more than merely create a suspicion of the existence of facts upon which the order is based; * * * [A]bsent a showing of antiunion motivation, an employer may discharge an employee for a good reason, a bad reason, or for no reason at all. NLRB v. I. V. Sutphin Co.–Atlanta, Inc., 5th Cir. February 8, 1967, 373 F.2d 890; NLRB v. Longhorn Transfer Serv[ice], Inc., 5th Cir. 1965, 346 F.2d 1003, 1006. If the specific employee happens to be both inefficient and engaged in union activities, that coincidence standing alone is insufficient to destroy the just cause for his discharge. NLRB v. Soft Water Laundry, Inc., 5th Cir. 1965, 346 F.2d 930, 934.

*Id.* 374 F.2d at 200; *followed in* NLRB v. Neuhoff Bros. Packers, Inc., 5 Cir. 1968, 398 F.2d 640, 645–646.

 Despite our duty to accept the Board's choice between two fairly competing inferences, *e. g.,* Universal Camera Corp. v. NLRB, *supra,* where there is insubstantial support in the record for the Board's inference that the discharge was unlawfully motivated, we may accord respect for a contrary inference, particularly where, as here, such contrary inference was drawn by the Trial Examiner. NLRB v. Neuhoff Bros. Packers, Inc., *supra,* at 647 and cases there cited.

*Threats to employee Osborn.*

It will be recalled that when Osborn informed Herbeck that Seaton had written a letter Herbeck responded that Seaton might be in trouble because of it. In that conversation, which was initiated

58

by Osborn, Herbeck also told Osborn that if the employees "try to go to the Labor Board or to bring in a union and everything that the Company would probably run the plant." The Board found that these statements had a coercive effect tending to dissuade Osborn from engaging in collective activity, thus violating Section 8(a) (1).

■ We do not think substantial evidence on the record as a whole supports this finding. Neither did the Trial Examiner. The conversation was short and isolated. There is no indication in the record of prior company hostility toward unions. *See* NLRB v. Camco, Incorporated, 5 Cir. 1965, 340 F.2d 803, 804, n. 6; cert. denied 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339. Furthermore, even assuming that these two statements might have had a coercive tendency in their immediate context, Osborn also testified that in a subsequent conversation with Herbeck he was given an explanation that "satisfied" him (that he was not being threatened or coerced). Among other things, Herbeck told Osborn he had not meant that Osborn would be fired if he joined a union, but that, if there was a strike, Herbeck and Swennes would try to run the plant. Osborn testified that no one ever told him he would be fired if he joined a union. In view of Osborn's own admission to the effect that Herbeck's statement had no coercive tendencies, we do not find the Board's inference of coercion to be fairly competing with the contrary inference of the Trial Examiner and we therefore reject it as not being supported by substantial evidence.

Whether expressly dealt with in this opinion or not, we have considered and rejected all the contentions made by General Counsel relative to the discharge of Seaton and the allegedly coercive statements to Osborn. Accordingly, the petition to set aside the Board's order is granted and the Board's cross-petition is denied.